IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,765

DIANA K. HILBURN,
*Appellant*,

v.

ENERPIPE LTD.,
*Appellee*.

SYLLABUS BY THE COURT

Section 5 of the Kansas Constitution Bill of Rights declares, "The right of trial by jury shall be inviolate." The quid pro quo test that has been applied to analyze challenges under section 18 of the Kansas Constitution Bill of Rights is inapplicable to challenges under section 5. The noneconomic damages cap under K.S.A. 60-19a02 violates the right protected by section 5, because it intrudes upon the jury's determination of the compensation owed personal injury plaintiffs to redress their injuries.

Review of the judgment of the Court of Appeals in 52 Kan. App. 2d 546, 370 P.3d 428 (2016). Appeal from Sedgwick District Court; TIMOTHY H. HENDERSON, judge. Opinion filed June 14, 2019. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case is remanded.

*Thomas M. Warner, Jr.*, of Warner Law Offices, P.A., of Wichita, argued the cause and was on the briefs for appellant.

*Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause, and *Justice B. King*, of the same firm, and *Kelly A. Ricke,* of the same firm, of Overland Park, were with him on the briefs for appellee.

*Toby Crouse*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were on the brief for intervenor Kansas Attorney General Derek Schmidt.

*Timothy J. Finnerty* and *Bryan R. Kelly*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, were on the brief for amicus curiae Kansas Association of Defense Counsel.

*James D. Oliver* and *Scott C. Nehrbass*, of Foulston Siefkin LLP, of Overland Park, and *Clayton Kaiser*, of the same firm, of Wichita, were on the brief for amicus curiae Kansas Chamber of Commerce and Industry, Inc.

*David R. Morantz*, of Shamberg, Johnson & Bergman, Chtd., of Kansas City, Missouri, and *James R. Howell*, of Prochaska, Howell & Prochaska, of Wichita, were on the brief for amicus curiae Kansas Trial Lawyers Association.

The decision of the court was delivered by

BEIER, J.:  This case requires us once again to examine the constitutionality of K.S.A. 60-19a02, which caps jury awards for noneconomic damages in personal injury actions. Plaintiff Diana K. Hilburn argues that the application of K.S.A. 60-19a02 to reduce her jury award of $335,000 to a judgment of $283,490.86 violated her rights under section 5 and section 18 of the Kansas Constitution Bill of Rights.

In *Miller v. Johnson*, 295 Kan. 636, 289 P.3d 1098 (2012), a majority of this court upheld the application of the noneconomic damages cap to a medical malpractice plaintiff's jury award in the face of challenges under section 5 and section 18. The *Miller* majority extended what it described as a "well-entrenched" section 18 quid pro quo analysis to section 5 challenges. Under that test, the Legislature must provide an

"adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18." 295 Kan. at 654.

Today, in this auto-truck accident case, we change course on section 5, declining to apply the quid pro quo test to analyze Hilburn's challenge. Section 5 declares, "The right of trial by jury shall be inviolate." As discussed below in detail, the noneconomic damages cap under K.S.A. 60-19a02 violates Hilburn's right protected by section 5 because it intrudes upon the jury's determination of the compensation owed her to redress her injury. We therefore reverse the Court of Appeals decision affirming the district court, reverse the district court's judgment, and remand this case to district court for entry of judgment in Hilburn's favor on the jury's full award. This decision eliminates any necessity of addressing Hilburn's section 18 claim.

FACTUAL AND PROCEDURAL BACKGROUND

Hilburn was injured in November 2010 when the car in which she was riding was rear-ended by a semi-truck. Hilburn sued the truck's owner, Enerpipe Ltd., alleging that the truck driver's negligence caused the collision and that Enerpipe was vicariously liable for its driver's actions.

In its answer to Hilburn's Petition, Enerpipe admitted the driver's negligence and conceded its vicarious liability.

The case proceeded to a trial on damages, after which a jury awarded Hilburn $335,000 in damages comprising $33,490.86 for medical expenses and $301,509.14 for noneconomic losses.

3

Defense counsel prepared a journal entry of judgment against Enerpipe for $283,490.86 because, "pursuant to K.S.A. 60-19a02(d), judgment must be entered in the amount of $250,000 for all of Diana K. Hilburn's noneconomic loss." Hilburn objected on the ground that K.S.A. 60-19a02 is unconstitutional. She alleged violations of sections 1, 5, and 18 of the Kansas Constitution Bill of Rights, as well as the jury trial and due process guarantees of the United States Constitution.

The district court judge acknowledged that Hilburn's case was distinguishable from *Miller*, which was a medical malpractice case, but he ultimately decided the constitutional issues in defendant's favor. The judge accepted Enerpipe's argument that there was an adequate substitute remedy for Hilburn's loss of any section 5 or section 18 rights, just as mandatory medical malpractice insurance had constituted an adequate substitute remedy in *Miller*. He relied on federal law mandating that a motor carrier operating in interstate commerce must maintain a minimum level of liability insurance, see 49 U.S.C. § 13906(a)(1) (2012); on Kansas law and regulation adopting the federal minimum liability requirements, see K.S.A. 2010 Supp. 66-1,108b; K.A.R. 82-4-3n (2014 Supp.); and on Kansas' no-fault auto insurance regime under the Kansas Automobile Injury Reparations Act, K.S.A. 40-3101 et seq. (KAIRA); see also K.S.A. 40-3107(e)-(f) (requiring all policies contain minimum levels of personal injury protection benefits). The district judge entered a $283,490.86 judgment for Hilburn.

Hilburn appealed to the Court of Appeals. In her brief, Hilburn asserted a facial challenge to the damages cap under section 5, asserting that the quid pro quo test should not be applied to analyze that claim. In addition, she argued that the cap violated section 18 because the Legislature had not provided a suitable or sufficient substitute remedy. According to Hilburn, the two necessary prongs of the quid pro quo test were unmet: The noneconomic damages limitation was not reasonably necessary in the public interest,

4

"as applied" to her; and the Legislature failed to provide an adequate substitute remedy for impairment of her constitutional rights.

The Court of Appeals panel rejected Hilburn's arguments and affirmed. See *Hilburn v. Enerpipe, Ltd.*, 52 Kan. App. 2d 546, 560, 370 P.3d 428 (2016). Believing itself bound by the precedent of *Miller*, the panel summarily declined Hilburn's invitation to reexamine the threshold legal issue of whether the quid pro quo test should apply to section 5. 52 Kan. App. 2d at 554.

The panel then turned to the first prong of the quid pro quo test for both section 5 and section 18 and determined that it had been satisfied. Modification of the right to jury trial under section 5 and the common-law right to remedy under section 18 was "'reasonably necessary in the public interest to promote the public welfare,'" because "the damages cap operates in a broader scheme of mandatory insurance and the State maintains an interest in that insurance remaining available and affordable to compensate accident victims." 52 Kan. App. 2d at 554, 556 (quoting *Miller*, 295 Kan. at 657).

The panel also concluded that the "'more stringent'" second prong of the quid pro quo test, that is, adequacy, had been satisfied because mandatory insurance for motor carriers guaranteed "a reliable source of recovery" for victims in accidents involving trucks. *Hilburn*, 52 Kan. App. 2d at 556, 558. The panel relied on federal and state mandatory motor vehicle insurance laws and KAIRA.

Hilburn petitioned this court for review, which was granted.

The Kansas Attorney General intervened after initial oral argument in this case, pursuant to K.S.A. 2018 Supp. 75-764. The Attorney General, like Enerpipe, argued that the quid pro quo test had been satisfied for both section 5 and section 18. But, like

Hilburn, he questioned the applicability of the test to section 5, arguing that "legislative restrictions on remedies do not violate the right to trial by jury." The Attorney General also asked this court to reconsider whether a statute alleged to violate section 18 must satisfy the quid pro quo test.

DISCUSSION

*Preservation*

As a preliminary matter, we take up whether Hilburn preserved her challenge to the applicability of the quid pro quo test for section 5 analysis.

The version of Kansas Supreme Court Rule 8.03(a)(4)(C) in effect at the time Hilburn filed her petition for review required that such a petition contain a "statement of the issues decided by the Court of Appeals of which review is sought" and said that this court would "not consider issues not presented or fairly included in the petition." Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79). Hilburn's petition focused exclusively on whether the Court of Appeals correctly held that the quid pro quo test was satisfied; it did not separately list as an issue or subissue whether the quid pro quo test applied in analyzing a section 5 claim. However, the same rule subsection that purported to limit the number and identity of issues that could be decided on petition for review also explicitly allowed us to "address a plain error not presented." Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79). And, in civil cases such as this, a different subsection of Supreme Court Rule 8.03 permitted but did not require us to consider "other issues that were presented to the Court of Appeals and that the parties have preserved for review." Supreme Court Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 81).

6

Hilburn argued in the district court that her section 5 jury trial right was violated by the noneconomic damages cap, preserving the necessary subissue on the proper legal test to determine the existence of a violation. Her brief to the Court of Appeals challenged whether the quid pro quo test should apply in analysis of her section 5 claim. Indeed, the Court of Appeals panel decided the issue in Enerpipe's favor. See *Hilburn*, 52 Kan. App. 2d at 554. Once Hilburn's petition for review was granted, she argued in her supplemental brief to this court that the "'inviolate' constitutional right to trial by jury should not be impaired by the judicial creation of a quid pro quo substitute remedy" and "urge[d] this court on review to strictly construe Section 5 to its simple, unambiguous meaning and not engage in the judicial creation of exceptions to this 'inviolate' right." In Enerpipe's supplemental brief, filed the same day, it argued we should continue to apply the quid pro quo test in a section 5 analysis. It advanced this argument again in its response to Hilburn's supplemental brief. As mentioned, the Attorney General, as intervenor, also has dealt with the applicability of quid pro quo analysis in cases alleging section 5 violations.

Supreme Court Rule 8.03 has since been amended, effective July 1, 2018, in part to address the inherent tension in the language that was in effect when Hilburn filed her petition for review. See Supreme Court Rule 8.03 (2019 Kan. S. Ct. R. 53). We are satisfied, however, that the issue of whether the quid pro quo test applies to analysis of Hilburn's section 5 claim is properly before us under the old rule. It was preserved in the district court, argued and decided in the Court of Appeals, and addressed by both parties and the intervenor before us.

*Standard of Review*

The core substantive issue before us is whether K.S.A. 60-19a02 is constitutional. "Whether a statute is constitutional is a question of law." *Board of Johnson County*

*Comm'rs v. Jordan*, 303 Kan. 844, 858, 370 P.3d 1170 (2016). We have often said that "before a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it. If a court can find any reasonable way to construe the statute as valid, it must." *Board of Johnson County Comm'rs,* 303 Kan. at 858; see also *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009) ("Whenever a court considers the constitutionality of a statute, the separation of powers doctrine requires the court to presume the statute is constitutional.").

Recently, however, we pared back this presumption of constitutionality in cases dealing with "fundamental interests" protected by the Kansas Constitution. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 611, 673-74, 440 P.3d 461 (2019). In such cases, the presumption of constitutionality does not apply.

Section 5 of the Kansas Constitution Bill of Rights states that "[t]he right of trial by jury shall be inviolate." We have previously acknowledged that "[t]his right is 'a basic and fundamental feature of American jurisprudence.'" *Miller*, 295 Kan. at 647 (quoting *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 549, 400 P.2d 995 [1965]). "'It is a substantial and valuable right and should never be lightly denied. The law favors trial by jury, and the right should be carefully guarded against infringements.'" *Miller*, 295 Kan. at 647 (quoting *Gard*, 194 Kan. at 549); see also *Miller*, 295 Kan. at 696 (Beier, J., concurring in part and dissenting in part) (right is more than right to impanel a jury, it is a process that includes: right to assemble a jury, right to present evidence, right to have the jury determine and award damages, and right to a judgment for the full damages as determined by jury and supported by evidence).

Hence, we have little difficulty deciding that the right protected by section 5 is a "fundamental interest" expressly protected by the Kansas Constitution Bill of Rights. As

8

such, we will not apply a presumption of constitutionality to challenges brought under section 5.

*The Challenged Statute*

K.S.A. 60-19a02(a) defines "'personal injury action'" as "any action seeking damages for personal injury or death." Further,

"(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000.

"(c) In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for noneconomic loss.

"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for noneconomic loss which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for noneconomic loss. . . ." K.S.A. 60-19a02.

The amount of the cap has since been amended upward and is currently $325,000. It is set to increase again, to $350,000, on July 1, 2022. But these changes are inapplicable to Hilburn and thus not at issue here. See K.S.A. 2018 Supp. 60-19a02(d).

*The Test for Section 5 Claims*

"Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence." *Miller*, 295 Kan. at 647 (citing *State ex rel. v. City of Topeka*, 36 Kan. 76, 85-86, 12 P. 310 [1886]); see also *Miller*, 295 Kan. at 696 (Beier, J., concurring in part and dissenting in part) ("This language preserves the

9

right to jury trial in those causes of action that were triable to a jury under the common law extant in 1859, when the Kansas Constitution was ratified by the people of our state."); *In re L.M.,* 286 Kan. 460, 476, 186 P.3d 164 (2008) (Luckert, J., concurring) ("[T]he uncompromising language of [section 5] applies if an examination of history reveals there was a right at common law to a jury trial under the same circumstances.").

We have consistently held that the determination of noneconomic damages was a fundamental part of a jury trial at common law and protected by section 5. See *Miller*, 295 Kan. at 647 (no dispute that determination of damages, including noneconomic damages, was question of fact for jury in common-law tort actions); see also *Smith v. Printup*, 254 Kan. 315, 324, 866 P.2d 985 (1993) ("There is no question in Kansas that the right to trial by jury includes the right to have a jury determine actual damages."); *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 358, 789 P.2d 541 (1990) (*Samsel II*) (jury trial right includes right to have jury determine damages in personal injury action), *disapproved of on other grounds by Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 343, 757 P.2d 251 (1988) (jury's traditional role is to decide issues of fact, determination of damages is issue of fact; thus jury's responsibility to determine damages), *disapproved of on other grounds by Bair*, 248 Kan. 824. Accord *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 640 (Mo. 2012) (Missouri Constitution's "inviolate" right to jury includes right to have jury determine facts, including noneconomic damages).

The noneconomic damages cap in K.S.A. 60-19a02 clearly implicates section 5's "inviolate" jury trial right, as that right has historically been understood. The next question is whether it impairs that right by interfering with the jury's fundamental function. See *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 376, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) (after determining applicability, court considers impairment; Seventh Amendment jury trial analysis asks whether "particular trial

10

decision must fall to the jury . . . to preserve the substance of the common-law right as it existed" at ratification); 9 Wright & Miller, Federal Practice & Procedure: Civil § 2302.4 (2008) (analysis of whether procedure violates Seventh Amendment "must look to whether that procedure obstructs or interferes with the jury's substantive role as the fact-finder").

We hold the statute necessarily infringes on the constitutional right.

"'The individual right to trial by jury cannot "remain inviolate" when an injured party is deprived of the jury's constitutionally assigned role of determining damages according to the particular facts of the case.' *Watts,* [376 S.W.3d at 640.] Giving the jury 'a practically meaningless opportunity to assess damages simply "pays lip service to the form of the jury but robs it of its function."' [376 S.W.3d at 642] (quoting *Sofie v. Fibreboard Corp.,* 112 Wash. 2d 636, 655, 771 P.2d 711 [1989] [en banc]); see also *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt,* 286 Ga. 731, 735-36, 691 S.E.2d 218 (2010) (striking down damages cap for infringing state constitution's inviolate right to jury trial); *Lakin v. Senco Products, Inc.,* 329 Or. 62, 78-79, 987 P.2d 463, 473 (1999) (same); *Moore v. Mobile Infirmary Ass'n,* 592 So. 2d 156, 164 (Ala. 1991) (same); *Smith v. Department of Ins.,* 507 So. 2d 1080, 1089 (Fla. 1987) (same); *Arneson v. Olson,* 270 N.W.2d 125, 136 (N.D. 1978) (same)." *Miller*, 295 Kan. at 698 (Beier, J., concurring in part and dissenting in part).

Despite this infringement of section 5's jury trial right by K.S.A. 60-19a02, a majority of this court held in *Miller* that any impairment was permissible as long as the two-part due process-based quid pro quo test applicable in section 18 analysis was satisfied. But the overlay of the quid pro quo test "transforms what the people made inviolate into something violable at will." 295 Kan. at 698-99 (Beier, J., concurring in part and dissenting in part). The court's previous decision to apply the quid pro quo test to section 5 "overlook[ed] long-standing limitations on the legislature's power to modify the common law; overestimate[d] the persuasive force of prior Kansas cases; and shortcut[]

11

the necessary cost-benefit evaluation" necessary when examining whether to keep or jettison originally erroneous precedent. 295 Kan. at 699 (Beier, J., concurring in part and dissenting in part).

In *Miller*, the majority ignored

"the plain 'inviolate' language chosen by Kansas citizens for Section 5's jury trial provision. Inviolate means not 'disturbed or limited.' *In re Rolfs,* 30 Kan. [758,] 762[, 1 P. 523 (1883)]. It is defined as '"[n]ot violated; unimpaired; unbroken; unprofaned."' *Samsel II,* 246 Kan. at 368 (Herd, J., dissenting); see also *Watts,* [376 S.W.3d at 638] ('inviolate' means free from change or blemish, pure, unbroken) (citing Webster's Third New International Dictionary 1190 [1993]); *Sofie*[ *v. Fibreboard Corp.*], 112 Wash. 2d [636,] 656, [771 P.2d 711 (1989) (en banc)] (citing same) ('inviolate' connotes deserving of highest protection, free from assault, trespass, untouched, intact). This inviolate right to jury trial is 'a basic and fundamental feature of American jurisprudence.' *Gard v. Sherwood Construction Co.,* 194 Kan. 541, 549, 400 P.2d 995 (1965); see also *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 340-41, 343, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) (Rehnquist, J., dissenting) (right so important that denial of 'right of jury trial was listed among the specific offensive English acts denounced in the Declaration of Independence'; right a 'bulwark' of liberties, so essential that it '"was probably the only one universally secured by the first American state constitutions"') (quoting Levy, Legacy of Suppression:  Freedom of Speech and Press in Early American History 281 [1960]).

"The language of Section 5 is 'uncompromising.' *In re L.M.,* 286 Kan. at 476 (Luckert, J., concurring). Section 5 imposes a 'clear, precise and definite limitation[] upon the powers of the legislature.' *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kan. 660, 665, 3 P. 284 (1884). It was chosen precisely because the people recognized that the right to jury trial required protection from legislative efforts to modify it in ways that destroy the substance of that right. See Wyandotte Const. Convention 462-63 (July 25, 1859) ('[T]hat very valuable right we propose to secure to the citizen in retaining the right of trial by jury, intact, will be accomplished by the words, "The right of trial by jury shall be inviolate."'); see also *State ex rel. v. City of Topeka,* 36 Kan. 76, 85-86, 12 P. 310 (1886)

(by preserving the right as 'inviolate,' framers intended that the right of trial by jury 'shall be and remain as ample and complete as it was at the time when the [C]onstitution was adopted')." *Miller*, 295 Kan. at 699-700 (Beier, J., concurring in part and dissenting in part).

As all members of this court acknowledged in *Miller*, it is within the power of the Legislature to modify the common law. See 295 Kan. at 648; 295 Kan. at 705 (Beier, J., concurring in part and dissenting in part). But "what may have been a mere common-law right to jury trial on the day before ratification of Section 5 was no longer a mere common-law right from ratification onward." 295 Kan. at 705 (Beier, J., concurring in part and dissenting in part).

"Ratification expressed the people's choice to elevate the common-law right to jury trial to enumerated constitutional status. That status put it beyond everyday legislative meddling. The people entrusted juries with the task of deciding damages. The legislature's unwillingness to [entrust juries with deciding damages]. . . requires endorsement by the people before it can enjoy the force of law." 295 Kan. at 705-06 (Beier, J., concurring in part and dissenting in part).

As the United States Supreme Court emphasized long ago:

"It is said that the common law is susceptible of growth and adaptation to new circumstances and situations, and that the courts have power to declare and effectuate what is the present rule in respect of a given subject without regard to the old rule; and some attempt is made to apply that principle here. The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions. [Citation omitted.] But here, we are dealing with a constitutional provision which has in effect adopted the rules of the common law, in respect of trial by jury, as these rules existed in 1791. To effectuate any change in these rules is not to deal with the common law, *qua* common law, but to alter the Constitution. The distinction is fundamental, and has been

13

clearly pointed out by Judge Cooley in 1 Const. Limitations, 8th Ed., 124." *Dimick v. Schiedt*, 293 U.S. 474, 487, 55 S. Ct. 296, 79 L. Ed. 603 (1935).

See also *Watts,* 376 S.W.3d at 643 (allowing Legislature to modify constitutional rights makes protections "of only theoretical value . . . [s]uch rights would not be rights at all but merely privileges that could be withdrawn"); *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt,* 286 Ga. 731, 736, 691 S.E.2d 218 (2010) (general legislative authority to modify common law does not permit abrogation of constitutional rights); *Sofie v. Fibreboard Corp.,* 112 Wash. 2d 636, 652-53, 771 P.2d 711 (1989).

> "Justice Herd made the same point in his dissent in *Samsel II:*

> "'Giving the legislature the authority to limit damages by changing the common law, or otherwise, violates § 5 of the Kansas Bill of Rights by taking the damage question away from the jury. A written constitution is adopted for the purpose of limiting the power of government. Providing that trial by jury shall be inviolate is a limitation on government as a protection of individual rights. There is no question the legislature has the power to change or abolish the common law. That, however, does not change the Kansas Constitution. A later change in the common law does not affect the meaning of § 5. Its meaning was fixed in 1859. The proper method of constitutional change is by amendment, not legislation.' 246 Kan. at 369-70 (Herd, J., dissenting).

> "Even the case that is generally considered the source of recognition of legislative power to modify common law, *Munn v. Illinois,* 94 U.S. 113, 134, 24 L. Ed. 77 (1876), is explicit about constitutional limitations on the power: 'Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations.' See also *In re Tax Appeal of ANR Pipeline Co.,* 276 Kan. 702, 725, 79 P.3d 751 (2003) (Kansas Constitution limits otherwise plenary power of legislature); *Harris v. Shanahan,* 192 Kan. 183, 207, 387 P.2d 771 (1963) ('It is axiomatic that [any] act of the legislature[] is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of

authority vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare.'); *Lemons v. Noller,* 144 Kan. 813, 817, 63 P.2d 177 (1936) (citing *State v. Weiss,* 84 Kan. 165, 168, 113 P. 388 [1911]; *Ratcliff v. Stock-yards Co.,* 74 Kan. 1, 16, 86 P. 150 [1906]) (legislature free to act except where Kansas Constitution restricts)." *Miller*, 295 Kan. at 706-07 (Beier, J., concurring in part and dissenting in part).

In *Miller*, a majority of this court relied on stare decisis to ground its application of the quid pro quo test to analysis of a section 5 jury trial challenge. In general, a "court of last resort will follow the rule of law it established in its earlier cases unless clearly convinced the rule was originally erroneous or is no longer sound because of changing conditions and more good than harm will come by departing from precedent." *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010).

But this rule "excuses us from following precedent that is 'plainly and unmistakably' the result of mistake and error.' *Prowant, Administratrix v. Kings-X,* 184 Kan. 413, 416-17, 337 P.2d 1021 (Jackson, J., dissenting), *rev'd on rehearing,* 185 Kan. 602, 347 P.2d 254 (1959)." *Miller*, 295 Kan. at 707-08 (Beier, J., concurring in part and dissenting in part); see also *Arizona v. Gant,* 556 U.S. 332, 348, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (Stare decisis does not require adherence to "a past decision when its rationale no longer withstands 'careful analysis.'") (quoting *Lawrence v. Texas,* 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 [2003]); *Bergstrom v. Spears Manufacturing Co.,* 289 Kan. 605, 610, 214 P.3d 676 (2009) ("This court is not inexorably bound by precedent; it will reject rules that were originally erroneous or are no longer sound.").

Moreover, "stare decisis is at its weakest in constitutional cases because our mistakes cannot be easily corrected by ordinary legislation." *Miller*, 295 Kan. at 708 (Beier, J., concurring in part and dissenting in part) (citing *State v. Hoeck,* 284 Kan. 441,

463, 163 P.3d 252 [2007]); see also *Agostini v. Felton,* 521 U.S. 203, 235, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (erroneous court interpretations in such cases "can be altered only by constitutional amendment or by overruling our prior decisions"); *Watts,* 376 S.W.3d at 644 (if people disagree with court interpretation of constitution, opportunity to change organic law more remote than opportunity to repeal, alter statute; "'[m]oreover, no set of judges ought to have the right to tie the hands of their successors on constitutional questions, any more than one [set of legislators] should those of its successors on legislative matters'") (quoting *Mountain Grove Bank v. Douglas County,* 146 Mo. 42, 54, 47 S.W. 944 [Mo. 1898]). And strict application of stare decisis must be tempered in constitutional cases because

> "[o]ur allegiance must be to the Constitution itself, 'not what we have said about it.'
> *Graves v. N.Y. ex rel. O'Keefe,* 306 U.S. 466, 491-92, 59 S. Ct. 595, 83 L. Ed. 927 (1939)
> (Frankfurter, J., concurring); see also *Harris v. Anderson,* 194 Kan. 302, 314, 400 P.2d
> 25 (1965) (Fatzer, J., dissenting) (quoting 3 Warren, The Supreme Court in United States
> History, p. 470: "'However the court may interpret the provisions of the Constitution, it
> is still the Constitution which is the law and not the decision of the court. 'To the decision
> of an underlying question of constitutional law no . . . finality attaches. To endure, it
> must be right.'"")." *Miller*, 295 Kan. at 708-09 (Beier, J., concurring in part and dissenting
> in part).

A careful examination of the majority opinion in *Miller* and the precedent it relied on reveals that application of a quid pro quo test to section 5 claims rests on a shaky foundation.

> "The [*Miller* majority] relies on *Kansas Malpractice Victims Coalition* and
> *Samsel II,* both of which applied the quid pro quo test to excuse impairment of the right
> to jury trial. *Samsel II,* 246 Kan. at 358, 362; *Kansas Malpractice Victims Coalition,* 243
> Kan. at 344-52. *Samsel II* followed *Kansas Malpractice Victims Coalition* on this point,
> *Samsel II,* 246 Kan. at 351-62; and *Kansas Malpractice Victims Coalition,* in turn, relied

16

on *Manzanares*[ *v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974)], saying that *Manzanares* 'found, in substance, that the injured person entitled to benefits under the statute received a sufficient quid pro quo for the limitation placed on his right to a jury trial.' *Kansas Malpractice Victims Coalition,* 243 Kan. at 344. In none of these three cases, however, did this court see fit to explain how or why the quid pro quo test, a due process-based rule originally relating to whether legislation impairs a vested right, can excuse legislation's impairment of a constitutional right to jury trial.

"Moreover, it appears that the initial reliance *Kansas Malpractice Victims Coalition* placed on *Manzanares* in order to apply quid pro quo arose out of a misreading. Nowhere in *Manzanares*' one-paragraph discussion of the right to jury trial claim before it did this court 'require that the legislature provide an adequate substitute of the right to trial by jury[.]' Note, *Testing the Constitutionality of Tort Reform with a Quid Pro Quo Analysis: Is Kansas' Judicial Approach an Adequate Substitute for a More Traditional Constitutional Requirement?*, 31 Washburn L.J. 314, 332 (1992)." *Miller*, 295 Kan. at 709 (Beier, J., concurring in part and dissenting in part).

In addition, application of a quid pro quo test to section 5 claims cannot be bolstered by reaching still farther back to *Shade v. Cement Co.*, 93 Kan. 257, 144 P. 249 (1914).

"*Shade* involved multiple constitutional challenges to the original workers compensation law. The claims were based on federal due process and equal protection, and on the Kansas Constitution Bill of Rights' Section 5 right to jury trial and Section 18 right to remedy. *Shade,* 93 Kan. at 258-59. *Shade*'s notable pithy rationale for rejecting these claims lumps the state constitutional theories together; and the only thing it makes clear is the determinative weight given to the elective nature of the original workers compensation system.

"'The objection based upon the supposed deprivation of a right of trial by jury is equally untenable, as determined in many adjudicated cases. The same is true of the arbitration feature and the rules for determining compensation. Without reviewing

17

*seriatim* all the specific objections made to this statute under the general charge that it violates constitutional safeguards, it is sufficient to say that they have all been met in judicial decisions in other jurisdictions after the most thorough and patient examination. . . . Briefly, it may be said that the operation of the system of compensation provided by the statute rests upon the free consent of employer and employee, given in the manner provided by the act. Without such consent on his part the employee retains all his remedies under common and statutory law. It is a matter of election.' 93 Kan. at 260 (citing *Matheson v. Minneapolis St. Ry. Co.,* 126 Minn. 286, 148 N.W. 71 [Minn. 1914] [election to be subject to system constitutes waiver of jury trial]; *Deibeikis v. Link-Belt Co.,* 261 Ill. 454, 104 N.E. 211 [1914] [same])." *Miller*, 295 Kan. at 710 (Beier, J., concurring in part and dissenting in part).

It is inaccurate to say that *Shade* applied the quid pro quo test to reject the section 5 challenge, as we have previously recognized in multiple cases. See *Baker v. St. Louis Smelting & Refining Co.,* 145 Kan. 273, 280, 65 P.2d 284 (1937) (260 emphasizing workers compensation system "'rests upon the free consent of employer and employee'"; thus "the liability of an employer to his employee under the act is a liability arising on contract") (quoting *Shade*, 93 Kan. at 260); *Potocan v. Hamilton Coal & Mercantile Co.,* 120 Kan. 326, 329, 243 P. 537 (1926) (citing *Shade,* 93 Kan. 257, for proposition Workers Compensation Act subject to no constitutional infirmity because not compulsory); *Smith v. Packing Co.,* 115 Kan. 874, 875, 225 P. 110 (1924) ("[Q]uestions as to whether various features of a workman's compensation act were violative of the fourteenth amendment have frequently been disposed of by reference to the fact that its application was made optional.") (citing *Shade*, 93 Kan. at 260).

Other courts and commentators discussing *Shade* have reached similar conclusions about its underlying rationale. See *Boyd v. Barton Transfer & Storage,* 2 Kan. App. 2d 425, 429, 580 P.2d 1366 (1978) (first case to consider *Shade* since workers compensation system made mandatory, court cites *Shade* among cases upholding earlier system "against constitutional challenges on the ground that it was optional with the employer

18

and employee"); see also *Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 160, 39 S. Ct. 227, 63 L. Ed. 527 (1919) (citing *Shade* for upholding act because voluntary); *Mosely v. Empire Gas & Fuel Co.,* 313 Mo. 225, 233-34, 281 S.W. 762 (1926) (same); *Harbis v. Cudahy Packing Co.,* 211 Mo. App. 188, 191, 241 S.W. 960 (1921) (observing "Kansas courts have held that the relation between employer and employee" under workers compensation law "is contractual") (citing *Shade*, 93 Kan. at 260); Phillips, *The Constitutional Right to a Remedy,* 78 N.Y.U. L. Rev. 1309, 1330 n.92 (2003) ("Decisions to uphold the statutes frequently were based on the fact that the employee or employer, or both, had the ability to opt out of the scheme.") (citing *Shade*, 93 Kan. 257); Comment, *Workers' Compensation Benefits Go From Bad to Worse: The Kansas Supreme Court Eliminates the Parallel Injury Rule,* 48 Washburn L.J. 705, 710 n.42 (2009) (describing *Shade* as upholding original workers compensation law on ground that employers, employees consented to coverage). *Rajala v. Doresky,* 233 Kan. 440, 661 P.2d 1251 (1983), is even weaker support for the *Miller* majority's application of a quid pro quo test for section 5 analysis. That case did not "explicitly" apply the test in considering a jury trial challenge.

> "The only issue in *Rajala* was whether the workers compensation law's abrogation of fellow-employee liability violated the Section 18 right to remedy provision. *Rajala,* 233 Kan. at 441-42. Likewise, the . . . citation of *Injured Workers of Kansas v. Franklin,* 262 Kan. 840, 942 P.2d 591 (1997), and *Scott v. Hughes,* 294 Kan. 403, 275 P.3d 890 (2012), for their discussion of the exchanges of rights and remedies between employers and employees inherent in the Kansas workers compensation scheme cannot help [the *Miller* majority]. These cases did not have anything to do with a jury trial challenge to the scheme. Thus neither . . . stands for[] the proposition that the quid pro quo test can be applied to rescue a statute from its violation of Section 5." *Miller*, 295 Kan. at 711-12 (Beier, J., concurring in part and dissenting in part).

In short, none of the Kansas cases relied upon by the *Miller* majority as controlling precedent for using the quid pro quo test on section 5 challenges withstands scrutiny.

"*Manzanares*, *Kansas Malpractice Victims Coalition*, and *Samsel II* give no explanation . . . of why the due process-based concept should be imported from Section 18. Furthermore, . . . efforts to press *Shade* and *Rajala* into service as substitutes for *Manzanares, Kansas Malpractice Victims Coalition*, and *Samsel II* are singularly unconvincing. *Shade* relied on an entirely different rationale to reject the jury trial and the other state constitutional challenge to the original workers compensation system before the court. *Rajala* did not involve any jury trial challenge at all. Under these circumstances . . . application of the quid pro quo test to Section 5 was originally erroneous and remains so." *Miller*, 295 Kan. at 712 (Beier, J., concurring in part and dissenting in part).

The *Miller* majority also asserted that the cost-benefit analysis involved in evaluating the wisdom of following precedent favored application of a quid pro quo test to analysis of section 5 claims. In its view, "overruling our past application of the quid pro quo test to excuse violation of the right to jury trial would require dismantling of the workers compensation and no-fault automobile insurance systems. See *Rajala,* 233 Kan. at 440 (workers compensation); *Manzanares,* 214 Kan. at 589 (no-fault)." *Miller*, 295 Kan. at 712-13 (Beier, J., concurring in part and dissenting in part). But the dismantling of those two systems was far from assured for several reasons.

"First, as discussed above, *Rajala* was a Section 18 decision that did not address the right to jury trial in any way. See *Rajala,* 233 Kan. at 441. Nothing about refusal to apply the quid pro quo test to save a statute impairing the right to jury trial has any bearing on *Rajala*'s Section 18 holding.

"Second, the comprehensive workers compensation system at issue in *Rajala* is totally distinct from the noneconomic damages cap applied to reduce [a plaintiff's damages under K.S.A. 60-19a02]. [C]ommon-law [personal-injury] cause[s] of action [as they] existed in 1859 [were] not wholly replaced with a comprehensive statutory scheme of compensation not employing jury trials at all. Far from it. . . . [P]ersonal injury

20

plaintiffs in Kansas are still required to file civil lawsuits; conduct necessary discovery; obtain required expert testimony; and prove negligence, causation, and damages to a jury by a preponderance of the evidence. The only thing changed by K.S.A. 60-19a02 is whether the district court judge can give effect to the jury's discharge of its constitutional assignment. In the workers compensation arena, although recoveries are fixed, they are directly proportional to the nature and extent of each claimant's injury and income. In addition, distinct Section 18 jurisprudence permitted wholesale abolition and replacement of a common-law cause of action because both sides received clear and comparable benefits from the legislative transaction. The new administrative system of no-fault compensation for injured workers left no common-law cause of action upon which Section 5's jury trial right could act. See *Watts,* [376 S.W.3d at 638] (constitutional right to jury trial contingent upon existence of civil action for damages). The cap [under K.S.A. 60-19a02] did nothing of the sort, and its rejection on Section 5 grounds would not cause the collapse of the workers compensation system, much less make it inevitable or imminent.

"Much of the same can be said of the no-fault automobile insurance system. It is markedly distinct from the damages cap at issue here. In order to receive prompt personal injury protection payments after a car accident, an injured person no longer needs to file a lawsuit to prove another's fault and the causal relationship between that fault and damages. Rather, the personal injury protection claimant simply submits a claim to the insurance company. The third-party common-law cause of action for those suffering relatively minor injury was replaced with a first-party insurance contract claim. As with workers compensation, the no-fault automobile insurance system means that every claimant's opportunity to recover is directly proportional to the seriousness of his or her case." *Miller*, 295 Kan. at 713-14 (Beier, J., concurring in part and dissenting in part).

In addition to overstating the potential cost of abandoning the quid pro quo test in section 5 cases, the *Miller* majority also overestimated the benefits of saving K.S.A. 60-19a02. It asserted that applying the quid pro quo test "foster[ed] certainty." 295 Kan. at 714 (Beier, J., concurring in part and dissenting in part). But continuing to apply quid pro quo to section 5 does exactly the opposite.

21

"Uncertainty is created when error is compounded by blind adherence to precedent that is analytically unsound. Certainty, predictability, stability, and respect for the rule of law are enhanced when this court does what it has otherwise insisted upon doing in every other case calling a legislative act into constitutional question. This is what every Kansan expects of us, and properly so. 'We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.' *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 264 Wis. 2d 60, 121, 665 N.W.2d 257 (2003). That is why '[i]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations.' *Barden v. Northern Pacific Railroad,* 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 992 (1894); see also *Watts,* [376 S.W.3d at 645] ('[d]eviations from clear constitutional commands—although longstanding—do not promote respect for the rule of law') (quoting *Independence-Nat. v. Independence School,* 223 S.W.3d 131, 137 [Mo. 2007])." *Miller*, 295 Kan. at 714 (Beier, J., concurring in part and dissenting in part).

Kansas' section 5 right to jury trial is distinct in every conceivable dimension from the section 18 due process-based right to remedy. They share no language; they share no drafting rationale. Indeed, the rights' placement in separate sections of the Bill of Rights makes it obvious that they articulate different concepts aimed to achieve different purposes, and thus merit unique analyses.

Finally, looking beyond our state borders, we note that, at the time *Miller* was decided, 19 states had addressed whether damages caps violated their state's constitutional jury protections, and not one had employed the quid pro quo test in its analysis. See 295 Kan. at 701-02 (Beier, J., concurring in part and dissenting in part) (collecting cases). Since the *Miller* decision, the Oregon Supreme Court has reversed its position in 1999's *Lakin v. Senco Products, Inc.*, 239 Or. 62, 987 P.2d 463 (1999), upholding rather than striking down a damages cap under the Oregon Constitution's jury trial provision. See *Horton v. Oregon Health and Science Univ.*, 359 Or. 168, 376 P.3d

22

998 (2016). It did not, however, rely on a quid pro quo test to reach the new outcome. On this point of law, Kansas has stood strangely alone.

For all of the reasons outlined above, we abandon the quid pro quo test for analyzing whether the noneconomic damages cap is unconstitutional under section 5 of the Kansas Constitution Bill of Rights.

*Fact-Law or Fact-Policy Distinction*

Because the *Miller* majority concluded that K.S.A. 60-19a02 satisfied the quid pro quo test, it did not need to engage in an exhaustive discussion of the more basic question of whether the damages cap infringes on section 5's right to trial by jury. It merely conceded quickly that the cap "encroaches" upon the jury trial right and moved to the quid pro quo analysis to excuse what would otherwise have been a fatal constitutional violation. As discussed in the concurring and dissenting opinion in *Miller*, the "encroachment" conclusion is logically and legally indistinguishable from a conclusion that the cap impairs the jury trial right of section 5 and is thus unconstitutional, and it should have ended the matter. See 295 Kan. at 698 (Beier, J., concurring in part and dissenting in part). It still should and does. We pause, however, to acknowledge and reject one further argument advanced by the Attorney General.

The Attorney General urges us to uphold the damages cap because of what he and other states have characterized as a fact-law or fact-policy distinction. For example, in Virginia, the Supreme Court has said,

> "The resolution of disputed facts continues to be a jury's sole function. 'The province of the jury is to settle questions of fact, and when the facts are ascertained the law determines the rights of the parties.' Thus, the Virginia Constitution guarantees only that a jury will resolve disputed facts.

23

"Without question, the jury's fact-finding function extends to the assessment of damages. Once the jury has ascertained the facts and assessed the damages, however, the constitutional mandate is satisfied. Thereafter, it is the duty of the court to apply the law to the facts.

"The [damages cap] does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, [the damages cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process.

". . . [A]lthough a party has the right to have a jury assess his damages, he has no right to have a jury dictate through an award the legal consequences of its assessment. [Citations omitted.]" *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 96, 376 S.E.2d 525 (1989).

The fact-law or fact-policy distinction has been relied on in varying degrees by almost all courts that have upheld damages caps in the face of jury trial-based challenges. See *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1050-51 (Alaska 2002) (decision to place cap on damages policy choice, not reexamination of factual question of damages determined by jury); *Kirkland v. Blaine County Medical Center*, 134 Idaho 464, 469, 4 P.3d 1115 (2000) (jury still allowed to act as fact-finder in personal injury cases; cap statute simply limits legal consequences of jury finding); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 401, 404 N.E.2d 585 (1980) (to extent of cap, right to have jury assess damages still available), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007), *and abrogated on other grounds by Collins v. Day*, 644 N.E.2d 72 (Ind. 1994); *Peters v. Saft*, 597 A.2d 50, 53-54 (Me. 1991) (party does not have right to jury determination of any question desired; right to jury determination only of questions of

fact that substantive law makes material); *Murphy v. Edmonds*, 325 Md. 342, 373, 601 A.2d 102 (1992) (Legislature did not attempt to transfer traditional fact-finding function of jury to judge; instead it abrogated any cause of action for noneconomic damages in excess of damages cap); *English v. New England Medical Center*, 405 Mass. 423, 426, 541 N.E.2d 329 (1989) (jury trial guarantee does not grant party right to put to jury any question he or she wishes, right "means that, with respect to those questions of fact that the substantive law makes material, the party has the right to have the determination made by a jury"); *Gourley v. Nebraska Methodist Health Sys., Inc.*, 265 Neb. 918, 953-54, 663 N.W.2d 43 (2003) (jury's primary function of fact-finding includes damages; court's primary function to apply law to facts; damages cap implicates remedy, availability of remedy raises question of law); *Tam v. Eighth Jud. Dist. Ct.*, 358 P.3d 234, 238 (Nev. 2015) (not role of jury to determine legal consequences of its findings); *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 476, 880 N.E.2d 420 (2007) (court simply applies limits as matter of law to facts found by jury); *Judd v. Drezga*, 103 P.3d 135, 144 (Utah 2004) (jury's duty to determine damages; court's duty to conform jury's finding to applicable law); see also *Matter of Certif. of Questions of Law*, 544 N.W.2d 183, 203 (S.D. 1996) (jury renders decision on damages, cannot mandate compensation as matter of law; unconstitutional on other ground). Although it did not expressly couch its decision in terms of a fact-law or fact-policy distinction, the Oregon Supreme Court implicitly followed a similar route in 2016's *Horton.* 359 Or. at 250. It held that the Oregon Constitution "guarantees litigants a procedural right to have a jury rather than a judge decide those common-law claims and defenses that customarily were tried to a jury" but does not "impose[] a substantive limit on the legislature's authority to define the elements of a claim or the extent of damages available for a claim." 359 Or. at 250.

The lone exceptional rationale among decisions that have upheld a damages cap challenged under a state constitutional jury trial provision challenge appears to be that in *Robinson v. Charleston Area Med. Center*, 186 W. Va. 720, 731, 414 S.E.2d 877 (1991).

25

In *Robinson*, the West Virginia Supreme Court of Appeals focused on a "reexamination" clause incorporated in the statement of the constitutional jury trial right. See W. Va. Const. art. 3, § 13 ("No fact tried by a jury shall be otherwise reexamined in any case than according to the rule of court or law."). Because that clause did not mention the Legislature, the legislatively mandated damages cap did not infringe on the jury trial right. 186 W. Va. at 731.

The decisions from 14 of our sister states that have upheld damages caps under attack for violating constitutional jury trial protections do not persuade us.

First, only 8 of the 14 interpreted and applied constitutional provisions including language similar to that of our section 5's "inviolate." See *Kirkland*, 134 Idaho at 466 (Idaho); *Johnson*, 273 Ind. at 383 (Indiana); *Gourley*, 265 Neb. at 953 (Nebraska); *Murphy*, 325 Md. at 351 n.3 (Maryland; "inviolably preserved"); *Tam,* 358 P.3d at 238 (Nevada); *Arbino*, 116 Ohio St. 3d at 474 (Ohio); *Horton*, 359 Or. at 226 (Oregon); *Matter of Certif. of Questions*, 544 N.W.2d at 186 (South Dakota). These eight decisions compose a small majority when compared to those of the highest courts of five states that have struck down damages caps as unconstitutional under constitutional provisions that make the jury trial right "inviolate." See *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 159 (Ala. 1991) (Alabama); *Smith*, 507 So. 2d at 1089-90 (Florida; reading access right in conjunction with jury trial right); *Atlanta Oculoplastic Surgery, P.C.*, 286 Ga. at 733 (Georgia); *Watts*, 376 S.W.3d at 637 (Missouri); *Sofie*, 112 Wash. 2d at 638 (Washington).

Second, we simply cannot square a right specially designated by the people as "inviolate" with the practical effect of the damages cap:  substituting juries' factual determinations of actual damages with an across-the-board legislative determination of the maximum conceivable amount of actual damages. See *Moore*, 592 So. 2d at 164

("Because the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes *less* than an advisory status."). Although, as a purely technical, theoretical matter, we agree that the mere application of an existing damages cap to reduce a jury's award is a matter of law, this statement begs the question at the heart of this case: To whom have the people of Kansas assigned the determination of the amount of the award? Unless an injured party has decided to waive his or her right under section 5, the answer is "the jury."

The Washington Supreme Court has addressed the jury's unique role in determining "ultimate facts," such as damages, and the particular importance of its role in determining noneconomic damages.

> "'To the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts—and the amount of damages in a particular case is an ultimate fact.' *See also Dacres v. Oregon Ry. & Nav. Co.,* 1 Wash. 525, 20 P. 601 (1889) (Act of 1883, creating a scheme for determining the value of train-killed animals by appraisers, was unconstitutional because it denied the right to a jury trial); *Worthington v. Caldwell,* 65 Wash. 2d 269, 273, 396 P.2d 797 (1964) ('Questions of damages should be decided by the jury'). [Citations omitted.]

> "The jury's role in determining noneconomic damages is perhaps even more essential. In *Bingaman v. Grays Harbor Comm'ty Hosp.,* 103 Wash. 2d 831, 835, 699 P.2d 1230 (1985), the husband of a woman who died painfully 35 hours after giving birth, the result of medical malpractice, brought a wrongful death and survival action. The only issue before this court was whether the trial judge had properly reduced the jury's damage verdict of $412,000 for the woman's pain and suffering. In resolving the issue in the plaintiff's favor, we stated: 'The determination of the amount of damages, *particularly in actions of this nature,* is primarily and peculiarly within the province of the jury, under proper instructions . . .' (Italics ours.) 103 Wash. 2d at 835. *See also Lyster v. Metzger,* 68 Wash. 2d 216, 224-25, 412 P.2d 340 (1966) (issue of damages, here primarily noneconomic, is within the jury's province); *Power v. Union Pac. R.R.,* 655

F.2d 1380, 1388 (9th Cir. 1981) (under Washington law, damages for loss of companionship determined by trier of fact).

"United States Supreme Court jurisprudence on the Seventh Amendment's scope in civil trials, while not binding on the states, also provides some insight. In *Dimick v. Schiedt,* 293 U.S. 474, 55 S. Ct. 296, 79 L. Ed. 603 (1935), the Court used historical analysis to determine whether the Seventh Amendment allowed additur. Citing cases and treatises dating from the time of the amendment's adoption, the Court found that determining damages, as an issue of fact, was very much within the jury's province and therefore protected by the Seventh Amendment. The Court also indicated that a judge should give more deference to a jury's verdict when the damages at issue concern a noneconomic loss. The Court quoted the English case of *Beardmore v. Carrington,* 2 Wils. 244, 248:

"'There is great difference between cases of damages which [may] be certainly seen, and such as are ideal, as between *assumpsit, trespass for goods* where the sum and value may be measured, and actions of *imprisonment, malicious prosecution, slander and other personal torts,* where the damages are matter of opinion, speculation, ideal . . .'

293 U.S. at 479, 55 S. Ct. at 298. The Court clarified the implications of the difference between these two classes of actions by quoting from Mayne's Treatise on Damages, at 571: "'in cases where the amount of damages was uncertain their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it."' 293 U.S. at 480, 55 S. Ct. at 298." *Sofie*, 112 Wash. 2d at 646-47.

Finally, we recognize that the people's assignment of the jury's role in assessing damages furthers the purpose of awards to make the particular injured party whole. See 22 Am. Jur. 2d, Damages § 28 ("The point of an award of damages, whether it is for breach of contract or for a tort, is, so far as possible, to put the victim where he or she would have been had the breach or tort not taken place."). Blackstone recognized this principle in his commentaries. "Now, as all wrongs may be considered as merely a privation of right, the one natural remedy for every species of wrong is the being put in

28

possession of that right whereof the party injured." 3 Blackstone, Commentaries on the Laws of England, at *116 (1765). Ideally, this would be "effected by a specific delivery or restoration of the subject-matter in dispute to the legal owner." 3 Blackstone, at *116. But where this was not a possible or adequate remedy, the injured party should receive "pecuniary satisfaction in damages . . . to which damages the party injured has acquired an incomplete or inchoate right, the instant he receives the injury, though such right be not fully ascertained till they are assessed by the intervention of the law." 3 Blackstone, at *116. The jury's traditional role in determining the amount of a pecuniary award necessary to make a party whole includes an assessment of noneconomic damages. See *Atlanta Oculoplastic Surgery, P.C.*, 286 Ga. at 735 (noneconomic damages long recognized as element of total damages in tort, citing Blackstone).

Regardless of whether an existing damages cap is technically or theoretically applied as a matter of law, the cap's effect is to disturb the jury's finding of fact on the amount of the award. Allowing this substitutes the Legislature's nonspecific judgment for the jury's specific judgment. The people deprived the Legislature of that power when they made the right to trial by jury inviolate. Thus we hold that the cap on damages imposed by K.S.A. 60-19a02 is facially unconstitutional because it violates section 5 of the Kansas Constitution Bill of Rights.

CONCLUSION

For the reasons outlined above, we reverse the decision of the Court of Appeals affirming the district court and reverse the district court's judgment. We remand this case to the district court for further proceedings in keeping with this decision.

NUSS, C.J., not participating.

29

STEGALL, J., concurring in part and concurring in judgment:  I agree with and join the majority of the court that today reverses the so-called "quid pro quo" test as applied in the context of a section 5 challenge under the Kansas Constitution Bill of Rights. I agree that if an act of the Legislature invades the historic province of the jury to decide a contested matter then the plain, original public meaning of section 5 is violated. I join the portion of the majority opinion describing and applying the plain and original public meaning of section 5.

I disagree, however, with the way a plurality of the court appears to assume that K.S.A. 60-19a02 must implicate section 5 in the first place. To me, this is far from clear. Whether the statute implicates section 5 is a threshold question and the answer may depend on the standard of review we apply. For this reason, I first consider and discuss the history of our "clear error" standard of review and our recent partial departure from that rule. Finally, I conclude that though it is a close call, K.S.A. 60-19a02 does in fact invade the historic province of the jury to decide a contested matter. As such, I concur in the judgment we reach that K.S.A. 60-19a02 violates section 5.

*Background*

To clarify how I differ from the three-justice lead opinion in today's decision, some background explanation will be helpful. For ease of reference, I will refer to the lead opinion as simply the "majority," although it is a true majority only for those portions I have joined, and otherwise represents only a plurality of justices on this court. The importance of this distinction will become apparent.

As the majority explains, there is a clear difference between section 5 and section 18 in the Kansas Constitution Bill of Rights. Slip op. at 8. The section 5 "right of trial by jury" that "shall be inviolate" is a procedural right to *who* decides contested questions in Kansas courts. It does not guarantee or prescribe the substantive matter of *which* questions Kansas courts can decide. A different provision of the Kansas Constitution— section 18—governs the latter. So the *procedural* right to have a jury (rather than, say, the Legislature) decide the kinds of contested questions juries historically decided is sacrosanct under the Kansas Constitution. But the *substantive* decision about what kinds of questions—in legalese, what causes of action—Kansas courts have the power to resolve is untouched by the section 5 guarantee. Put another way, just because a jury would have resolved a particular substantive question under Kansas common law in 1859 does not mean that a party has a constitutional right to a jury resolution of that question today. This is because the scope of contested questions that Kansas courts may answer can and does change—and this does not violate section 5.

Historically, which questions—which causes of action—Kansas courts have the power to resolve has been a matter of common law decision-making by Kansas courts. But it is a universally accepted principle that the Legislature has the power to abrogate or modify the common law. See, e.g., *Manzanares v. Bell*, 214 Kan. 589, 616, 522 P.2d 1291 (1974) ("[T]he Legislature has the power to modify the common law."). That is, the Legislature has the power to substantively change or even eliminate common law causes of action; or to create new statutory causes of action. See *Shirley v. Glass*, 297 Kan. 888, 893, 308 P.3d 1 (2013) ("Legislatures may create private causes of action that the common law did not recognize."); see also *Stanley v. Sullivan*, 300 Kan. 1015, 1018, 336 P.3d 870 (2014) ("As a general rule, statutory law supersedes common law."). With respect to civil remedies, the constitutional restraint on this legislative discretion is found in section 18 of the Kansas Constitution Bill of Rights. Put simply, so long as it does not run afoul of the Constitution, the Legislature has the power to describe and define *which*

31

questions Kansas courts can resolve. And when those questions are of the kind historically given to juries to decide, section 5 only requires that those questions *remain* with Kansas juries.

Given this, the threshold question we should ask of K.S.A. 60-19a02 or any statute challenged under sections 5 and 18 is whether it is a procedural measure affecting *who decides* or a substantive measure affecting *what is being decided*. If it is the former, section 5 and its inviolate guarantee applies. If it is the latter, section 18—with its wider guard rails—applies.

*Is K.S.A. 60-19a02 procedural or substantive?*

The Attorney General gets at this key threshold determination—albeit obliquely—when he argues the so-called "fact-law" distinction. He urges us to adopt the rationale of the Virginia Supreme Court, which the majority also quotes:

> "The [damages cap] does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, [the damages cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process." *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 96, 376 S.E.2d 525 (1989); slip op. at 24.

And indeed, some of our predecessors on this court have followed a similar analytical path. See *Samsel v. Wheeler Transport Services, Inc.,* 246 Kan. 336, 363, 789 P.2d 541 (1990) (McFarland, J., concurring).

In my view, the majority does not give enough careful attention to the argument that K.S.A. 60-19a02 does not implicate section 5 at all because it is a remedy provision that simply modifies an available cause of action—and should therefore be analyzed under section 18 instead of section 5. I am concerned the majority repeats the error (identified by then Justice McFarland in *Samsel*) of "lumping together the right to trial by jury on the question of liability and the remedy to be afforded if liability is established, and then freezing the lump in a common-law time warp." 246 Kan. at 363 (McFarland, J., concurring). I agree with Justice McFarland that there is "no legal basis for including the scope of the remedy in the right to a jury trial. . . . [T]he scope of the remedy to be afforded is a matter of legislative determination . . . ." 246 Kan. at 363 (McFarland, J., concurring).

In fact, the damage cap has some markings of both a procedural (who decides) and a substantive (what gets decided) measure. It cannot be both, and the constitutionality of the cap will likely turn on which category we assign it to. On the one hand, the *effect* of the cap is to substantively limit all causes of action for noneconomic damages. On the other hand, the cap is not written in the language of a modification of a personal injury cause of action. In fact, the cap does not take any question away from the jury or substantively alter its role at all. The very fact that the jury is permitted to "find" a phantom damage amount beyond the cap which is then "replaced" by the legislative judgment suggests the Legislature is actually substituting its decision for that of the jury.

Finally, K.S.A. 60-19a02(d)'s requirement that "the court shall not instruct the jury on the limitations of this section" is a clear indication to me that the Legislature sought to substitute its judgment for the judgment of the jury. Why else would the Legislature play hide-the-ball with something so consequential? Juries are told the substantive elements of the causes of action being tried in front of them. The legislative refusal to let the jury know about the damage cap tips the balance of consideration in my mind from a

33

substantive modification of the cause of action to a procedural interference with the inviolate right to a jury protected by section 5. The Legislature that passed K.S.A. 60-19a02 wanted to achieve a substantive outcome without modifying the substantive cause of action. So, it decided to substitute its decision for that of the jury's. It changed *who* decides, not *what* is being decided.

There may be many reasons the Legislature took the procedural rather than the substantive route to achieve its policy goals. Perhaps the Legislature worried that straightforwardly modifying the substantive cause of action would incentivize juries to shift damage awards to other causes of action or categories of damages. Perhaps the political will did not exist to do directly what some believed could be accomplished procedurally.

So which category does K.S.A. 60-19a02 belong to? Answering this question, in turn, leads me to first consider our standard of judicial review.

*De Novo or Clear Error Review?*

The majority acknowledges the boilerplate standard of review we use to consider the constitutionality of a statute: "[B]efore a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it. If a court can find any reasonable way to construe the statute as valid, it must." *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 858, 370 P.3d 1170 (2016).

But, citing our recent decision in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 680, 440 P.3d 461 (2019), the majority declines to apply this "clear error" rule of judicial review in today's case. Slip op. at 8. In *Hodes*, a majority of this court rolled back the

presumption of constitutionality in cases involving "fundamental interests" under the Kansas Constitution. 309 Kan. at 673.

In this case, whether we review the constitutionality of K.S.A. 60-19a02 de novo, or with a presumption of constitutionality that can only be overcome if we have no reasonable doubt about the alleged constitutional violation, matters to the outcome. If I were to apply the presumption and its highly deferential standard of review, I would be forced to conclude that K.S.A. 60-19a02 is a substantive measure modifying an available cause of action in Kansas. Then I would consider whether this substantive modification of an available cause of action violated section 18. This outcome is mandated under our "clear error" standard of review because when "all doubts are resolved in favor of upholding" the statute the "constitutional violation" is not "clear." *Board of Johnson County Comm'rs*, 303 Kan. at 858.

I have been—and remain—critical of judicial exercises in dividing up constitutional rights and provisions into preferred (fundamental) and less preferred (or even ignored) categories. See *Hodes*, 309 Kan. at 774 (Stegall, J., dissenting) ("[I]t is the courts' job to patrol boundaries, not to decide . . . 'fundamental' or 'substantive' values."). I am even less enamored with the judicial practice of treating these categories differently as a matter of judicial review. See 309 Kan. at 720 (Stegall, J., dissenting) (critiquing the adoption of "judicially favored rights and a byzantine system of tiered scrutiny"). So I cannot agree with the proposition that we ought to exercise different standards of review depending on which part of the Constitution we are interpreting or enforcing. Even so, I am content, at present, to abandon our clear error standard of review in favor of de novo review in this case, as set forth by the majority. See slip op. at 8. The reason is two-fold. First, over my dissent in *Hodes*, de novo review in a case involving so-called "fundamental" rights is now controlling precedent in Kansas. Second, and more importantly, as discussed below, I suspect the infirmity in the precedent does not lie in

going too far, but in not going far enough. Perhaps courts should exercise de novo review over Kansas statutes when *any* portion of our Constitution is implicated, not only when judicially favored rights are involved.

Thus, applying a de novo standard of review, I conclude the Legislature that passed K.S.A. 60-19a02 did not alter the cause of action for noneconomic damages but instead substituted its judgment for the jury's. As set forth in the majority opinion, this violates section 5 of the Kansas Constitution Bill of Rights.

*Reconsidering the Clear Error Rule*

I take this opportunity to question whether the clear error rule should be retained for any species of constitutional review in Kansas. Is it proper for this court to let statutes stand that probably—or even almost certainly—violate *any part* of the Kansas Constitution just because the violation is not clear or without any doubt? It is an important question that cuts to the heart of the judicial power itself. The parties, however, have not raised or argued the issue. Because resolving it in this case is unnecessary under the current precedent of this court, I will only embark on a skeletal discussion of the question which, by necessity, must arise in earnest sometime soon.

What I have been calling our "clear error" standard of review is often referred to as *Thayerism* in academic literature—named for Professor James B. Thayer after his 1893 article "*The Origin and Scope of the American Doctrine of Constitutional Law*" appeared in the Harvard Law Review. 7 Harv. L. Rev. 129 (1893); see Grey, *Thayer's Doctrine: Notes on Its Origin, Scope, and Present Implications*, 88 Nw. U. L. Rev. 28 (1993). After surveying the law of judicial review, Thayer concluded that courts "can only disregard the [statute] when those who have the right to make laws have not merely made a

mistake, but have made a very clear one,—so clear that it is not open to rational question." 7 Harv. L. Rev. at 144.

Thayer's doctrinal formulation of what was otherwise an inchoate body of law received an early endorsement from the influential Supreme Court Justice Oliver Wendell Holmes. See Mendelson, *The Influence of James B. Thayer upon the Work of Holmes, Brandeis, and Frankfurter*, 31 Vand. L. Rev. 71, 73 (1978). Justice Holmes—often described as the father of modern era judicial restraint—once remarked that a judgment concerning constitutionality often "turns on the feeling of the community" and "we accept the judgment unless it makes us puke." Letter from Justice Holmes to Harold Laski (October 23, 1926), *in* Holmes-Laski Letters:  The Correspondence of Mr. Justice Holmes and Harold J. Laski 1916-1935, pp. 887, 888 (Howe ed., 1953). Thus, Thayerism can be described as a kind of judicial puke test—is the law in question so unconstitutional that judges simply can't stomach it?

In Kansas, there is evidence that we at least acknowledged some form of Thayerism from our earliest days as a state. See *State ex rel. Crawford v. Robinson and others*, 1 Kan. 17, 27, 1862 WL 397 (1862) ("It has been repeatedly held, by the Supreme Court of nearly all the States of the Union, that no statute should be declared unconstitutional, unless its infringement of the superior law is clear, beyond substantial doubt."). There were also times we questioned the doctrine's relevance to our decision making. For example, in *Comm'rs of Wyandotte Co. v. Abbott*, 52 Kan. 148, 157, 34 P. 416 (1893), we noted that "[w]e appreciate the well-settled doctrine of this court, as, also, of the supreme courts of nearly all the states, that no statute should be declared unconstitutional unless the infringement of the superior law is clear, beyond substantial doubt." But even so, we declared that it would be "'dangerous . . . to announce, that any of the provisions of the constitution may be obeyed or disregarded at the mere will or

pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of the instrument.'" 52 Kan. at 157-58.

For most of our history, however, we have routinely recited some version of Thayerism as a constraining principle when reviewing the constitutionality of statutes. See *Board of Johnson County Comm'rs*, 303 Kan. at 858 ("[B]efore a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it."); *State v. Cook*, 286 Kan. 766, 768, 187 P.3d 1283 (2008) ("We will not declare a statute unconstitutional as applied unless it is clear beyond a reasonable doubt that the statute infringes on constitutionally protected rights."); *Moody v. Board of Shawnee County Comm'rs*, 237 Kan. 67, 74, 697 P.2d 1310 (1985) ("A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt."); *Hunt v. Eddy*, 150 Kan. 1, 10, 90 P.2d 747 (1939) ("Statutes should not be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt."); *State v. Sherow*, 87 Kan. 235, 239, 123 P. 866 (1912) ("This court has always endeavored to interpret acts of the legislature with the utmost liberality and to uphold them, unless beyond reasonable doubt they are found to conflict with some provision of the higher law. Doubts have always been resolved in favor of the statute.").

But we have never engaged in any sustained analysis of the constitutional roots of the rule or inquired whether Thayerism is proper under our government's constitutional structure. Simply put, the question is whether the "judicial power" vested by article 3, section 1 of the Kansas Constitution "exclusively in one court of justice" is limited by Thayerism. Do Kansas courts have the power to overturn statutes as unconstitutional even when the unconstitutionality is not clear beyond a reasonable doubt? As mentioned, answering this question is beyond the scope of today's opinion. But it is ripe for future litigation and review by this court. For now, four short thoughts will suffice.

First, deciding the proper measure of deference courts must show to the other branches of government implicates the separation of powers and thus our government's constitutional structure. I have noted before that the decline of "this court's separation of powers jurisprudence . . . was aided in no small part by our application of judicial deference." *Solomon v. State*, 303 Kan. 512, 541, 364 P.3d 536 (2015) (Stegall, J., concurring). I criticized our court for invoking the presumption of constitutionality to uphold statutes we believed were unconstitutional, concluding that

> "while judicial deference to the exercise of legislative or executive powers is entirely meet and proper, the same deference shown to the legislative or executive *departments* when they act *outside* of their respective vested powers is, in actual fact, an abdication of the vested judicial power to say what the law is.

> . . . .

> ". . . I would return this court to the active judicial role and obligation to guard and protect a clear and strong wall of separation between each of the three great departments of government—keeping each within its proper province and protecting those provinces from colonization by the other two departments. It is within the judicial province to carefully exercise this power without deference to the other branches . . . ." 303 Kan. at 543, 545 (Stegall, J., concurring).

While not a direct assault on Thayerism, at a minimum this suggests the strong presumption of constitutionality undermines the bedrock constitutional principle of separation of powers. Here it must be noted that Thayer's presumption is distinct from the doctrine of constitutional avoidance, which is a rule of statutory construction that applies when a statute is ambiguous. See *State v. Ryce*, 303 Kan. 899, 966, 368 P.3d 342 (2016) (Stegall, J., dissenting) (distinguishing the constitutional avoidance doctrine, which

preserves the Legislature's policy choices, from deference, which abdicates the judicial role), *adhered to on reh'g* 306 Kan. 682, 396 P.3d 711 (2017).

Second, to fully flesh out these arguments, it would be necessary to investigate the original public meaning of "the judicial power" at the time the Kansas Constitution was written and ratified. See *State v. Riffe*, 308 Kan. 103, 113-14, 418 P.3d 1278 (2018) (Stegall, J., concurring) (explaining the two basic tenets of original public meaning jurisprudence: that the Constitution's meaning is fixed at the time of its adoption and its meaning is based on the common understanding of the people adopting it). To date, the most thorough, though indirect, consideration of that question is found in my recent dissenting opinion in *Hodes*. *Hodes*, 309 Kan. at 707 (Stegall, J., dissenting).

In *Hodes*, I analyzed section 1 of the Kansas Constitution Bill of Rights at length, concluding that it was originally understood as a provision limiting the police power of the Legislature. 309 Kan. at 768 (Stegall, J., dissenting). I detailed how section 1 mandated judicial review of *all* legislative acts under a standard I colloquially called "rational basis with bite." 309 Kan. at 768 (Stegall, J., dissenting). Under this standard, "[a]pplying the necessary deference, a court must examine the *actual* legislative record to determine the *real* purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State." 309 Kan. at 767 (Stegall, J., dissenting). Again, at least on the surface, it is difficult to square Thayerism with such review.

Third, justices on other state supreme courts have compellingly argued against the application of Thayerism in their jurisdictions. For example, in one notable concurrence, Justice Richard B. Sanders of the Washington Supreme Court rejected Thayerism because it lacked textual support in the constitution and denied citizens the protection of an independent and impartial judiciary. *Island County v. State*, 135 Wash. 2d 141, 955

P.2d 377 (1998) (Sanders, J., concurring). As Justice Sanders explained, "'where the will of the legislature declared in its statute, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former.'" 135 Wash. 2d at 157 (quoting The Federalist No. 78 [Alexander Hamilton] [May 28, 1788], reprinted in The Federalist Papers by Alexander Hamilton, James Madison and John Jay, pp. 395-96 [Garry Wills ed., 1982]). For "it is the constitution, and only the constitution, through which the people speak for themselves. Their voice is fundamental, and it is only by their consent that we are governed." 135 Wash. 2d at 158. Similarly, Justice Rebecca Grassl Bradley of the Wisconsin Supreme Court warned, "[I]n contrast to the structural separation of powers our framers envisioned, judicial deference gives the legislature both the pen and the gavel over their own laws, and imposes a 'tremendous burden' on individuals attempting to limit the constitutional overreach of legislative power." *Mayo v. Wisconsin Injured Patients and Families Compen. Fund*, 383 Wis. 2d 1, 53, 914 N.W.2d 678 (2018) (Grassl Bradley, J., concurring) (quoting Burke, *The "Presumption of Constitutionality" Doctrine and the Rehnquist Court:  A Lethal Combination for Individual Liberty*, 18 Harv. J.L. & Pub. Pol'y 73, 90 [1994]).

Fourth and finally, it is important to concede that despite its weaknesses, Thayerism is not without its virtues. Chief among them is the pragmatic virtue of encouraging judges to resist an excess of judicial formalism. Judge Richard Posner has, perhaps, done the most convincing work on this point. Judge Posner helpfully contrasts Thayerism with the rise of constitutional "theory." The promise of constitutional theory has always been that theoretical principles, properly applied, will produce "correct" constitutional outcomes. Thayerism, however, is not designed to produce a single "right" answer, but is instead designed to aid judges who want to decide cases "sensibly or prudently." Posner, *The Rise and Fall of Judicial Self-Restraint*, 100 Cal. L. Rev. 519, 535 (2012).

Judge Posner attributes—rightly so in my view—the decline in Thayeristic judging (if not the decline of its rhetoric) to the rise of constitutional theory purporting to deliver correct outcomes. "The precondition to a judge's embrace of Thayer's standard . . . is to have no theory of how to decide whether a statute or an executive action violates the Constitution. . . . Today, with constitutional debate awash with theory, judges may feel a certain nakedness in having none." 100 Cal. L. Rev. at 538. So, if there is one, knowable, and correct answer to every constitutional question, the idea (implicit in Thayer's formulation) that a statute *might* or *might not* be constitutional loses most of its rhetorical heft and all of its analytical oomph.

Thus, on the one hand, Thayerism has declined in an atmosphere of increasing confidence that constitutional theory can give judges and scholars "the keys to unlocking the Constitution's secrets." 100 Cal. L. Rev. at 546. On the other hand, Thayerism suffers from what Posner calls the "ratchet theory of judicial restraint," which occurs when "unrestrained liberals expand constitutional rights" and "restrained conservatives preserve those rights by complying scrupulously with precedent in order to limit their own discretion." 100 Cal. L. Rev. at 547. In this environment, "[j]udicial self-restraint has ceased to be a contender." 100 Cal. L. Rev. at 548.

Of course, Thayerism is not the only nontheoretical principle that can restrain judges. And Judge Posner's definition of judicial pragmatism—a rejection of the formalist notion that "a legalistic algorithm" will produce a correct decision in "every case"—suggests other paths of self-restraint are available to adherents of constitutional theory. 100 Cal. L. Rev. at 539-40. Even originalist judges must exercise *judgment*. See Issacharoff, *Pragmatic Originalism?*, 4 NYU J.L. & Liberty 517, 531 (2009); but see Kramer, *Two (More) Problems with Originalism*, 31 Harv. J.L. & Pub. Pol'y 907, 907 (2008) ("there is no such thing as pragmatic originalism").

42

The warning to judicial theorists that we abandon prudent, sensible, and self-restrained judging at our and the Republic's peril should not fall on theoretically deafened ears. Yes, even a committed originalist ought to be "a jurist aware of his own humanity, attuned to the humanity of those before him, and willing to allow both to shape his judgment." Judge, *Judges and Judgment: In Praise of Instigators*, 86 U. Chi. L. R. (forthcoming Feb. 2019); see *Riffe*, 308 Kan. at 117 (Stegall, J., concurring) ("[H]umility—attendant as it is to the indeterminacy of language and the difficulties of the interpretive process—must be considered a third, equally important leg of the originalist stool."). Prudential principals such as justiciability, judicial humility, a recognition of the limits of judicial competency, constitutional avoidance, respect for precedent, and the duty of candor when explaining our decisions all should play a role.

*Conclusion*

In short, applying de novo review to what I consider a difficult constitutional call, I am compelled by the unique characteristics of the damage cap, as I describe them above, to conclude that the Legislature has substituted its judgment for the judgment of the jury. While the policy ends sought by the Legislature may be acceptable, here, the Legislature has chosen means that section 5 forecloses. The Legislature remains free—within the bounds of section 18—to limit or otherwise modify the common law cause of action for damages. But it must do so clearly and straightforwardly. Otherwise, the section 5 right is illusory, and the judgments of Kansas juries are no better than a mirage.

Therefore, I concur in the judgment.

LUCKERT, J., dissenting: I dissent from the majority's holding that the cap on noneconomic damages set in K.S.A. 60-19a02 violates the right to a jury trial as protected by section 5 of the Kansas Constitution Bill of Rights. Unlike the majority, I would follow *Miller v. Johnson*, 295 Kan. 636, 289 P.3d 1098 (2012), which applied the so-called quid pro quo test to determine K.S.A. 60-19a02 did not violate a medical malpractice plaintiff's rights under section 5. Applying that same test and the rationale of *Miller* to Diana Hilburn's claim of damages against a motor carrier and its driver, I conclude: (1) the various statutes and regulations mandating motor carrier liability insurance and K.S.A. 60-19a02 are reasonably necessary in the public interest to promote the public welfare; and (2) the Legislature has substituted an adequate statutory remedy for Hilburn's right to have a jury determine her damages. These two conclusions satisfy the quid pro quo test, meaning K.S.A. 60-19a02 does not violate Hilburn's rights under either section 5 or section 18 of the Kansas Constitution Bill of Rights.

Two threshold considerations require discussion before I reach the quid pro quo analysis, however. First, contrary to the majority's conclusion, Hilburn did not preserve for this court's review the issue of whether the quid pro quo test should not be applied to a section 5 analysis. Our analysis thus should begin where Hilburn started her argument before the district court. Citing *Miller*, she argued it is distinguishable. As I will discuss in more detail, I conclude it is not. Second, I disagree with the majority's decision to overturn *Miller* and other decisions that apply the quid pro quo test for deciding whether statutes limiting the right to a jury violate the Constitution. Overturning precedent runs against the doctrine of stare decisis, especially when Kansans have relied on the law when writing, negotiating, and agreeing to insurance, indemnity, and other contracts.

1. *Hilburn did not preserve the issue of whether the quid pro quo test applies.*

The majority concluded that Hilburn preserved the issue of whether the quid pro quo test applies to a section 5 analysis. I disagree because Hilburn did not present the issue to the district court, the Court of Appeals did not decide it, and Hilburn did not identify it as an issue in her petition for review. Thus, contrary to the majority's holding, Hilburn failed to preserve the issue for our review. (In this context, I refer to both the three-justice plurality and the concurring opinion as the majority. The plurality concludes Hilburn preserved this question. Slip op. at 6-7. The concurring opinion does not discuss the point but implicitly adopts that holding by joining the portion of the plurality that "reverse[s] the so-called 'quid pro quo' test as applied in the context of a section 5 challenge under the Kansas Constitution." Slip op. at 30.)

In the district court, Hilburn acknowledged this court's decision in *Miller* and its holding that the quid pro quo test applied to section 5 challenges. Rather than argue a different test applied, she sought to distinguish *Miller* from her situation. In doing so, she pointed out that *Miller*'s result hinged on the Health Care Provider Insurance Availability Act's, K.S.A. 40-3401 et seq., requirement that all medical providers have malpractice insurance coverage up to specified limits. The *Miller* court held that the existence of an insurance mandate guarantees a plaintiff will recover some amount of damages, and that guarantee, assured by Kansas statutes, provides an adequate quid pro quo. The cap on noneconomic damages was therefore constitutional as applied to a medical malpractice plaintiff. See *Miller*, 295 Kan. at 659-65. Hilburn argued there was no similar quid pro quo in her case because "the requirement of mandatory insurance for semi trucks is not Kansas law, rather it's federal law."

The district court rejected Hilburn's argument, concluding her attempt to distinguish *Miller* rested on "a distinction without a difference." The district court thus

held that *Miller* "applies here as well and that the legislature also equally has the right to limit noneconomic damages because they require and modify a common law obligation that did not exist regarding mandatory automobile insurance." Neither Hilburn nor the district court questioned whether *Miller* employed the correct test. Thus, the issue was not raised in the district court.

That procedural history leads to Hilburn's first preservation obstacle. A party usually cannot argue an issue on appeal that the party did not raise in district court. Exceptions exist, but the party must argue why an exception applies before we will consider the issue. See, e.g., *State v. Thach*, 305 Kan. 72, 81, 378 P.3d 522 (2016); see also Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."). Hilburn made no attempt to argue one of the exceptions applied. She has thus failed to preserve this question.

For the purposes of our discretionary review of the panel's decision at Hilburn's request she faces a different preservation issue, this time related to her arguments before the Court of Appeals. There, she specifically argued this court should not have applied the quid pro quo test in *Miller* or any other situation in which legislation encroached on the jury trial right under section 5. But the Court of Appeals panel, apparently overlooking Hilburn's failure to preserve the issue in the district court, quickly disposed of this argument, noting it "is duty bound to follow Supreme Court precedent absent some indication that the court is abandoning its prior position." *Hilburn v. Enerpipe, Ltd.*, 52 Kan. App. 2d 546, 554, 370 P.3d 428 (2017) (citing *Farley v. Above Par Transportation*, 50 Kan. App. 2d 866, 877, 334 P.3d 883 [2014], *rev. denied* 302 Kan. 1009 [2015]). The panel thus "use[d] the quid pro quo test when considering the constitutionality of K.S.A. 60-19a02 as applied to Hilburn." 52 Kan. App. 2d at 544. Consequently, the panel did not reach any conclusion about whether this court had

correctly decided *Miller*. Instead, applying the quid pro quo test, the panel affirmed the district court. At one point, it summarized its reasoning:

> "[T]he Supreme Court [in *Miller*] relied on the insurance scheme established in the Health Care Provider Insurance Availability Act, an act that does not apply to other torts. Because the State has established a similar insurance scheme for injuries caused by the negligence of motor carriers and automobile drivers, we find the rationale of the *Miller* court controls our decision in this case." 52 Kan. App. 2d at 548.

Hilburn petitioned for our review of this holding, raising four issues. All four relate to the panel's analysis of whether the insurance requirements in motor carrier regulations and the Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 et seq., supply an adequate substitute remedy for the cap's encroachment on her section 5 rights. None mentioned whether the panel applied the appropriate test. Not until *after* this court granted review did Hilburn file a supplemental brief advancing arguments about whether the quid pro quo analysis has a place in section 5 jurisprudence and, if not, what test should apply in its stead. Hilburn waited too long to raise the issue.

When Hilburn filed her petition for review, our rules required:

> "(C) *A statement of the issues decided by the Court of Appeals of which review is sought*. The court will not consider issues not presented or fairly included in the petition. The court, however, may address a plain error not presented. In a civil case, *the petitioner also must list, separately and without argument, additional issues decided by the district court which were presented to, but not decided by, the Court of Appeals, which the petitioner wishes to have determined if review is granted.*" (Emphases added.) Kansas Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79).

A party thus must list an issue it wants this court to reach. Then, and only then, is the issue properly preserved. And only if properly preserved does the exception relied on

by the majority—Rule 8.03(h)(1)—come into play. That exception states:  "In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties *have preserved for review*." (Emphasis added.) Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 81). We recently discussed this preservation rule in *Castleberry v. DeBrot*, 308 Kan. 791, 796, 424 P.3d 495 (2018).

There, we held a petitioner must list any issue not decided by the Court of Appeals that the petitioner wants this court to consider. Otherwise, the petitioner fails to preserve the issue in a way that allows us to exercise our discretion to consider the issue. We explained that the discretion granted by (h)(1) "ties to Rule 8.03(a)(4)(C), which requires parties to identify and separately list any issues presented to—but not decided by—the Court of Appeals that the party believes the Supreme Court should consider in its review." 308 Kan. at 796. We reminded litigants that "Rule 8.03(h)(1) is not a stealth mechanism to excuse the specificity required by Rule 8.03(a)(4) and our other rules controlling the review process." 308 Kan. at 796.

Despite Rule 8.03(a)(4), Hilburn did not list the issue. Yet the majority attempts to untether the provisions without explaining why *Castleberry* was erroneous or, alternatively, why *Castleberry* does not apply.

Instead, the majority relies on the plain error exception in Rule 8.03(a)(4)(C). I can find no case discussing this exception or how to apply it. And the majority cites none. But, in context, I read the provision to require that the district court or the Court of Appeals panel—not this court—to have committed plain error. But neither the district court nor the Court of Appeals panel committed plain error when they applied *Miller*. As noted, both courts recognized they had to follow *Miller*. Their conclusion is correct under settled caselaw. See *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010). Today's majority does not suggest otherwise. Instead, the majority holds *this court* erred in *Miller*.

Rule 8.03(h)(1)—a rule about this court's review of a Court of Appeals decision—does not open the door for us to revisit one of our prior decisions unless a party preserves the issue. Hilburn did not.

I thus would hold that Hilburn has not preserved the issue of whether a test other than quid pro quo should apply. This court should thus apply the quid pro quo test to Hilburn's assertion that the noneconomic damage cap violates her right to a jury trial under section 5 of the Kansas Constitution Bill of Rights.

2. *The doctrine of stare decisis instructs us to apply* Miller.

After stretching our rules to reach whether *Miller*'s application of the quid pro quo analysis to section 5 should be reversed, the plurality concludes the doctrine of stare decisis does not dictate we apply *Miller*. Slip op. at 15-19. Two members of today's plurality took that same position in their dissent in *Miller*. For the most part, those justices repeat that analysis today.

The *Miller* majority explained why the stare decisis doctrine applied when we decided *Miller* and nothing has altered the validity of that explanation:

> "The doctrine of stare decisis maintains that once a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same legal issue is raised. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent. *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010). Stare decisis "'promote[s] system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting [*Samsel v. Wheeler Transport*

*Services, Inc.*, 246 Kan. 336, 356, 789 P.2d 541 (1990) [*Samsel II*)]) 'Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.' *Samsel II*, 246 Kan. at 356.

"A quid pro quo analysis in Section 5 challenges to the legislature's limitations on recovery for personal injuries has been employed by this court in varied contexts, including workers compensation (*Rajala* [*v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983)]), no-fault automobile insurance coverage (*Manzanares* [*v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974)]), medical malpractice (*Kansas Medical Malpractice Victims* [*Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988)]), and general tort litigation (*Samsel II*). To retreat from that analysis now, our court would have to overrule those cases and embark on a new analytical model that would collaterally create uncertainty about the constitutionality of the Workers Compensation Act, which has been upheld since our 1914 decision in *Shade*, and what is now known as the Kansas Automobile Injury Reparations Act, upheld since our 1974 decision in *Manzanares*. See *Samsel II*, 246 Kan. at 361.

"In addition, there is a link between Section 5 and Section 18 issues in a damages case such as this, so it seems logical when dealing with statutory caps to have Section 5 and Section 18 encroachments measured against the same standard as has been done in our prior caselaw. As discussed in greater detail below, our caselaw dealing with Section 18 right-to-remedy issues is well entrenched using a quid pro quo analysis and it simply makes sense to have the same analytical model for Section 5. After all, noneconomic damages are a subset of compensatory damages; therefore, the statutory cap impacts a plaintiff's compensatory damages, which is a category of remedy at common law protected by Section 18. *Smith v. Printup*, 254 Kan. 315, 325, 866 P.2d 985 (1993). Moreover, the quid pro quo model readily allows the legislature to understand that it must provide an adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18.

"Accordingly, we are not clearly convinced use of the quid pro quo model was originally erroneous or is no longer sound because of changing conditions, or that more good than harm would come by departing from this precedent. See *Rhoten*, 290 Kan. at

50

112. And while our court has come to different outcomes after employing the quid pro quo analysis in Section 5 challenges, this does not detract from its viability as an analytical model to determine such challenges. See *Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991) (Adequacy of the substitute remedy as it applies to comprehensive remedial legislation must be made on a case-by-case basis.); *Lemuz v. Fieser*, 261 Kan. 936, Syl. ¶ 6, 933 P.2d 134 (1997) (In considering the adequacy of the quid pro quo of comprehensive legislation that substitutes a statutory remedy for one that formerly existed at common law, 'no hard and fast rule can apply to all cases.').

"We hold that a quid pro quo analysis is appropriate for determining [Amy] Miller's Section 5 right-to-jury trial claims against K.S.A. 60-19a02." *Miller*, 295 Kan. at 653-55.

Today, a majority of this court rejects these reasons for applying the stare decisis doctrine. I am no more persuaded by the majority's position today than I was when two members of the plurality expressed their view when dissenting from *Miller*. That said, for me, the stare decisis doctrine plays a compelling and determinative role in my position, just as it did when the court decided *Miller*. In my view, the majority downplays the consequences of overruling *Miller*. The majority's decision today upends caselaw addressing jury trial limitations imposed in workers compensation, medical malpractice, no fault insurance, and general tort litigation. If nothing else, Kansans have written, negotiated, and executed innumerable insurance policies and indemnity contracts relying on the limitations of the damages caps. As we have recognized, "'[c]onsiderations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 [1991]). Thus, we have generally declined to overrule precedent that would undercut the reliance placed on our past decisions when writing, issuing, and buying policies for such things as automobile insurance. See 277 Kan. at 715. The majority gives little heed to the consequences of changing the rules that underlie these contracts. In

51

doing so, it creates instability. In turn, it undercuts the stare decisis principles on which our system of the rule of law depends.

In part, today's majority does so by taking the view that the *Miller* majority misread the caselaw holding the workers compensation system did not infringe on section 5 rights. Today's majority concludes the analysis in these cases was based on consent, not the quid pro quo test. The *Miller* majority discussed this argument at some length:

> "This view, however, can be criticized as an oversimplification of the [workers compensation] statute. The opt-out provision in the original workers compensation law was entirely passive in nature, and its effect was not based on a knowing and voluntary waiver or affirmative consent. Instead, the law upheld in *Shade* [*v. Cement Co.*, 93 Kan. 257, 260, 144 P. 249 (1914)] abolished an injured worker's 'inviolate' right to a jury trial as stated in Section 5 even though the worker had done nothing to accept the benefits under the statute or forego his or her constitutional right to a jury trial. The statute simply took away this inviolate right unless the worker performed an intentional act to preserve it by opting out of the statutory provisions. Thus, the *Shade* decision's influence on any Section 5 analysis cannot be as easily discarded as the dissent argues.
>
> "Regardless, the opt-out provision was removed in 1974, making the system mandatory for both employees and employers. L. 1974, ch. 204, sec. 8 (amending K.S.A. 44-505). And our more recent decisions emphasize that the Workers Compensation Act constitutionally balances the interests of employees and employers—a balance described as an adequate quid pro quo." 295 Kan. at 649-50.

Today's majority rejects this discussion because these later cases involved a section 18, rather than a section 5, challenge. This misses the point that a quid pro quo analysis would—and has—served as a basis for upholding the constitutionality of the Workers Compensation Act, even if on section 18 grounds. And because until today this court has analyzed section 18 and section 5 under the same test, the section 18 caselaw

implicitly foreclosed a section 5 attack. But no longer. Today's majority leaves shaky ground in many areas of law that had long been firmly settled.

In such circumstances, the doctrine of stare decisis instructs us to follow precedent. And that is what I would do.

3. *Mandatory motor carrier liability insurance provides an adequate substitute remedy for the rights K.S.A. 60-19a02 curtails.*

I agree with the majority on one point: "[T]he determination of noneconomic damages was a fundamental part of a jury trial at common law and protected by section 5." Slip op. at 10 (citing *Miller*, 295 Kan. at 647). But I disagree with the majority's analysis of how K.S.A. 60-19a02 impacts the common-law right or the test to be applied. Using the quid pro quo test, I view *Miller* as persuasive and conclude K.S.A. 60-19a02 does not violate section 5. Thus, I dissent. And because I reach that conclusion I must consider Hilburn's section 18 claim. For the issue presented today, the two sections go hand-in-hand because *Miller* applied the same quid pro quo test to both sections 5 and 18. *Miller*, 295 Kan. at 657.

In reaching this conclusion, I reject Hilburn's position on the four issues she preserved in her petition for review. Each of them focuses on the panel's application of the quid pro quo test and *Miller* to the factual and legal circumstances of Hilburn's claim. Hilburn's four issues can be distilled into a single question: Has Hilburn received an adequate substitute remedy for the limitation caused by the noneconomic damages cap in K.S.A. 60-19a02 on her section 5 and section 18 rights to have the jury determine—and to have judgment for the full amount of—her noneconomic losses? I conclude she has.

I reach this conclusion by extending the rationale in *Miller*, which applied the same quid pro quo test to both sections 5 and 18. Under this test, K.S.A. 60-19a02 does

53

not violate either section 5 or 18 so long as it (1) is reasonably necessary in the public interest to promote the public welfare; and (2) the Legislature has substituted an adequate statutory remedy for the modification of the individual rights at issue. *Miller*, 295 Kan. at 657.

Before us, Hilburn disputes only the second prong of the test. She did not seek our review of the Court of Appeals panel's conclusion that the damages cap satisfies the first prong. As a result, she failed to preserve for this court's review any aspect of that portion of the panel's analysis. See *Snider v. American Family Mutual Ins. Co.*, 297 Kan. 157, 172, 298 P.3d 1120 (2013). For this appeal, the cap thus satisfies the first prong—it is reasonably necessary in the public interest to promote the public welfare. See *Hilburn*, 52 Kan. App. 2d at 556.

Under the second prong of the quid pro quo analysis, a court must determine whether the Legislature provided an adequate statutory remedy for the modification of the individual rights at issue. *Miller*, 295 Kan. at 664. This analysis focuses on "the context" within which the impairment of the common law right "operates." See 295 Kan. at 659 ("As a medical malpractice plaintiff, Miller's damages cap operates within the context of the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act."). Analyzing context necessarily means we must decide each case on its own merits. A court thus must consider both the extent of the deprivation and the relative significance of the substitute. See 295 Kan. at 660-62 (comparing scope of limitation on noneconomic damages with significance of readily available recovery from doctors' mandatory liability insurance); *Bair v. Peck*, 248 Kan. 824, 843-44, 811 P.2d 1176 (1991) (reasoning mandatory liability insurance minimums were "a sizeable quid pro quo . . . and certainly [were] an adequate substitute remedy for the common-law rights given up by injured malpractice victims.").

Focusing first on the extent of the deprivation, the *Miller* court determined the cap on noneconomic damages is "very real, [but] limited in its scope." 295 Kan. at 661. The court noted the cap's application, which causes a plaintiff to lose some noneconomic damages, is "significantly more serious" than deprivations upheld in other cases. 295 Kan. at 660-61 (citing *Lemuz*, 261 Kan. 936 [holding statute barring action for corporate negligence against hospital for negligently extending staff privileges to doctor whose malpractice injured plaintiff did not violate section 18]; *Aves v. Shah*, 258 Kan. 506, 524, 906 P.2d 642 [1995] [holding statute immunizing state fund that provides excess liability coverage to doctors from claims based on fund's alleged bad-faith refusal to settle a claim within policy limits did not violate section 18]; *Bair*, 248 Kan. at 845 [holding statute immunizing health care providers qualified for excess coverage under state fund from vicarious liability for professional services negligently provided by other fund-covered health care providers did not violate section 18]; *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 [1974] [holding statute prohibiting actions for noneconomic loss arising from automobile accidents unless medical expenses exceeded statutory threshold did not violate section 18]).

At the same time, the cap is limited in scope because it does not leave a litigant totally without compensation. Miller and Hilburn were left in a better position than some litigants in other cases in which we had applied the quid pro quo test. See *Miller*, 295 Kan. at 661 (citing *Bonin v. Vannaman*, 261 Kan. 199, 221, 929 P.2d 754 [1996] [holding statute of repose barring claims arising from tortious acts committed against minors not brought within 8 years of act did not violate 18-year-old plaintiff's section 18 rights when it barred her tort claims arising from medical malpractice allegedly committed 15 years earlier]; *Rajala v. Doresky*, 233 Kan. 440, 442, 661 P.2d 1251 [1983] [holding statute barring civil action against fellow employee for injury compensable under Workers Compensation Act did not violate injured employee's section 18 rights]; *Neely v. St. Francis Hospital & School of Nursing, Inc.*, 192 Kan. 716, 722-23, 391 P.2d 155 [1964]

[holding statute shielding funds held by bank for nonprofit hospital from garnishment violated judgment creditor's section 18 rights]).

The second consideration is the significance or quality of the substituted remedy. To satisfy the quid pro quo analysis, the litigant must have been provided "a significant, individualized substitute remedy." See *Miller*, 295 Kan. at 661. Because "a judgment that cannot be collected is worthless," mandatory insurance requirements providing a litigant with a guaranteed source of recovery for the injury for which the capped noneconomic damages are sought may constitute an adequate quid pro quo. See *Miller*, 295 Kan. at 661-62 (holding mandatory minimum primary and excess liability coverage for medical malpractice adequate quid pro quo for cap on noneconomic damages in malpractice lawsuit).

The fact of mandatory minimums, alone, is insufficient, however. The court must also consider the relative balance between the benefits conferred and the right curtailed. In doing so, a court is not required "to look only to a contemporaneous quid pro quo within the same statutory enactment containing the noneconomic damages cap." 295 Kan. at 661. "[M]ajor statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparations in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo." 295 Kan. at 660 (citing *Lemuz*, 261 Kan. at 955). This must be done case by case, and "the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act. If so, then no new or additional quid pro quo is necessary to support the modification . . . ." *Bair*, 248 Kan. at 844. Because this test is applied case by case, the *Miller* court framed its quid pro quo analysis in the context of a damages cap applied in a medical malpractice case governed by the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act.

Under that Act as it existed when we decided *Miller*, doctors had to maintain professional liability insurance with policy minimums of at least $200,000 per claim and at least a $600,000 annual aggregate for all claims made during the policy period. The Act required doctors to elect one of three levels of excess coverage from the state Health Care Stabilization Fund ranging from $100,000 to $800,000. And the Act required insurers to participate in an apportionment plan to supply insurance to doctors who are unable to obtain insurance "through ordinary methods." *Miller*, 295 Kan. at 662. The Act guaranteed to those who obtain medical care from a doctor that the doctor is insured, and that the insurance would cover damages up to $200,000 from primary insurance coverage and another $100,000 from the Fund.

Based on these mandatory levels of insurance coverage, the *Miller* court held an adequate substitute remedy existed for the cap even though Miller's jury had awarded her $575,000 in noneconomic damages, for which the district court entered judgment for $250,000 as K.S.A. 60-19a02 required. In holding the cap did not violate sections 5 and 18, the *Miller* court reasoned:

> "For Miller, having an available source of recovery of the statutorily mandated minimums provides her with a significant, individualized substitute remedy. And as pointed out by more than one *amici*, a judgment that cannot be collected is worthless. So under this statutory scheme, Miller has an obvious direct benefit not available to all others." 295 Kan. at 662.

Then, considering the cap's amount, the court observed "the legislature's failure to increase the $250,000 cap on noneconomic damages over the more than 20 years since it first set that amount is troubling . . . ." But, despite its concern, the court could not conclude "that the legislature's failure to increase the statutory cap has sufficiently diluted the substitute remedy to render the present cap clearly unconstitutional when viewed in

light of the other provisions in the Act that directly and exclusively benefit a medical malpractice plaintiff." 295 Kan. at 665.

Likewise, this court held the Health Care Provider Insurance Availability Act provided an adequate substitute remedy when deciding the two earlier cases of *Bair* and *Lemuz*. In *Bair*, the court reasoned that without the mandatory insurance coverage there would be no guarantee of coverage and a fund from which to collect. "That is a sizable quid pro quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims," specifically for loss of the ability to hold defendants liable under a theory of vicarious liability. *Bair*, 248 Kan. at 843-44. In *Lemuz*, where the elimination of liability for a hospital negligently granting privileges to a doctor was at issue, the court considered whether the reduction in the amount of mandatory insurance from what the court had considered in *Bair* changed the result. The court held the reduction did not change its holding:

> "Absent the amended Act, many Kansas health care providers would not have any malpractice liability coverage, either because they could not qualify for it or could not afford it. Thus, the Act, the Plan, and the Fund still constitute an adequate quid pro quo for the abrogation of the plaintiffs' remedy to bring a corporate negligence action against a hospital, despite the amendments to the Act and Fund. This remedy has not been emasculated to a point where it is no longer a viable and sufficient substitute remedy." *Lemuz*, 261 Kan. at 956.

The *Lemuz* court also noted that the Legislature had supplemented the quid pro quo provided by the insurance requirements by enacting statutes requiring hospitals to "engage in risk management to ensure that all incompetent physicians are discovered and denied staff privileges. With these statutes, the very purpose of the corporate negligence cause of action is fulfilled." 261 Kan. at 958. But the court reiterated that the mandatory insurance requirements alone were sufficient:

58

"Under the amended Fund, the minimum amount of medical malpractice insurance the doctor is now required to carry is $300,000. If they can prove negligence, the plaintiffs will recover at least $300,000. Without the Act and the Fund, the doctor might not have been insured at all and the plaintiffs might have recovered nothing. In a medical malpractice case, the doctor has his or her personal fortune at stake if adequate insurance is not purchased. It is basically the doctor who has little to risk who carries the minimum insurance. The public is benefitted by any insurance that is carried by that doctor. This is, and should be to some extent, a legislative call and we are unable to say that requiring $300,000 minimum to be available in every case is so inadequate that it is an inadequate quid pro quo. The plaintiffs herein will personally receive the benefit of the portion of the original quid pro quo that remains—required primary medical malpractice insurance and guaranteed excess medical malpractice insurance." 261 Kan. at 959.

Enerpipe argues a similar rationale applies because motor carriers have mandatory insurance obligations that guarantee a source from which a plaintiff injured by a motor carrier can collect a damage award. Under Title 49 of the United States Code, the federal secretary of transportation and the Surface Transportation Board have jurisdiction as specified in Title 49, Subtitle IV, Part B, "over transportation by motor carrier and the procurement of that transportation to the extent that . . . property . . . [is] transported by motor carrier . . . between a place in . . . a State and a place in another State . . . ." 49 U.S.C. § 13501 (2012). The Code defines "motor carrier" as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (2012). Motor carriers must be registered under U.S.C. Title 49, Subtitle IV, Part B, Chapter 139, in order to legally operate. 49 U.S.C. § 13901(a) (2012). Registration is permitted only if the Secretary of the United States Department of Transportation (USDOT) determines the prospective registrant complies with several requirements, including "the minimum financial responsibility requirements established by the Secretary . . . ." 49 U.S.C. § 13902(a)(1)(A)(vi) (2012). The Code directs the Secretary to prescribe regulations imposing minimum levels of financial responsibility—not less than $750,000—to cover

public liability and property damage "for the transportation of property by motor carrier or motor private carrier." 49 U.S.C. § 31139(b)(1)(b), (2) (2012); see 49 C.F.R. § 387.9 (adopting minimum levels of financial responsibility). Regulations define "financial responsibility" as "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth in this subpart covering public liability." 49 C.F.R. § 387.5. They define "public liability" as "liability for bodily injury or property damage." 49 C.F.R. § 387.5.

The parties agree these regulations apply here. Hilburn stated in her brief to the Court of Appeals that the semi-truck that hit her vehicle was a motor carrier, was registered and titled in Texas, was engaged in interstate commerce at the time of the accident, was over 47,000 pounds, was 50 feet long and had 5 axles, and was registered with the United States Department of Transportation. She added: "The fact that the semi had a [US]DOT number alone indicates that the [US]DOT has exercised its jurisdiction over the semi-truck. See *Vanartsdalen v. Deffenbaugh Indus*., 2011 U.S. Dist. LEXIS 28279 [2011 WL 1002027] (Dist. Kan. 2011)."

In Enerpipe's reply, it agreed with these facts and said that the federal regulations required it to maintain a minimum of $750,000 in liability insurance. Hilburn responded by agreeing with that representation and citing 49 U.S.C. § 31139(b)(2); 49 C.F.R. § 387.301(a), and *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868 (10th Cir. 2009).

Kansas statutes also apply to vehicles using Kansas roadways. As applicable here, "[n]o public motor carrier of property or passengers or private motor carrier of property or local cartage carrier shall operate any motor vehicle for the transportation of either persons or property on any public highway in this state except in accordance with" the Kansas motor carrier laws. K.S.A. 66-1,111. The Kansas Corporation Commission (KCC) has "full power, authority and jurisdiction to supervise and control motor carriers

60

as defined in K.S.A. 66-1,108 . . . ." K.S.A. 2010 Supp. 66-1,108b; see also K.S.A. 66-1,112(a) (granting KCC authority over motor carriers of property). The Legislature has also charged the KCC with adopting safety rules and regulations with which public and private motor carriers of property must comply as a condition of operating "any motor vehicle on any public highway in this state . . . ." K.S.A. 66-1,129.

Kansas has also integrated with the regulatory network established through the federal system. Kansas statutes make it "unlawful for any private motor carrier to operate as a carrier of property or passengers within this state either in intrastate commerce or in interstate commerce without first having obtained from the commission a license or permit or without being registered pursuant to federal statutes." K.S.A. 66-1,115. And the Act makes it "unlawful for a public motor carrier of property, of household goods or of passengers to operate in interstate commerce regulated by the relevant federal agency without registering its motor vehicles in its base state pursuant to federal statutes in order to operate in Kansas." K.S.A. 66-1,116(a).

The Kansas laws apply only to the extent not preempted by federal law. Federal law generally preempts state legislation "related to a price, route or service of any motor carrier . . . or any motor private carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). But it does not, among other things, "restrict . . . the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization . . . ." 49 U.S.C. § 14501(c)(2)(A).

Under its authority to supervise public motor carriers to the extent not preempted by federal law, to issue permits to private motor carriers, and to promulgate motor carrier safety rules and regulations, the KCC has generally adopted the requirements of 49 C.F.R. pt. 387. See K.A.R. 82-4-3e; see also K.A.R. 82-4-3n (2016 Supp.).

Insurance is mandated by both federal and Kansas law. The KCC regulations prohibit public motor carriers and contract motor carriers of property, household goods, and passengers and private motor carriers of property or household goods from "operat[ing] a motor vehicle, trailer, or semitrailer for the transportation of persons or property within the provisions of the motor carrier law of this state until an insurance policy is filed in accordance with K.S.A. 66-1,128." K.A.R. 8-4-21. "Each policy of insurance filed with the commission for approval shall be in amounts not less than the minimum of liability required under K.S.A. 66-1,128 . . . ." K.A.R. 82-4-23(f). For motor carriers subject to KCC licensure, the Legislature has charged the KCC with setting insurance limits at:

"reasonable amounts as the commission determines by rules and regulations is necessary to adequately protect the interest of the public with due regard to the number of persons and amount of property involved. Such amounts shall be not less than $100,000 for personal injury or death to any one person in any one accident, $300,000 for injury or death to two or more persons in any one accident and $50,000 for loss to property of others in any one accident, which liability insurance shall bind the obligors to pay compensation for injuries to persons and loss of damage to property resulting from the negligent operation of such carrier." K.S.A. 66-1,128(a).

Enerpipe asserts it is subject to these requirements. The record lacks sufficient information to verify that assertion. Perhaps only Enerpipe's base-state's requirements and the federal regulations define the level of its insurance coverage. Regardless, through the web of federal regulations that Kansas has incorporated into its framework, the parties agree Enerpipe had to have at least $750,000 in insurance coverage.

The Court of Appeals panel held this motor carrier insurance scheme was an adequate substitute remedy because, "[a]lthough the required insurance amounts are

different, [the scheme] behaves similarly to the medical malpractice insurance one" by providing Hilburn with "a reliable source of recovery." 52 Kan. App. 2d at 558. Hilburn did not persuade the panel that the insurance benefitting her was mandated by the federal government, rather than the Kansas Legislature. See 52 Kan. App. 2d at 558. The panel also discounted the fact that the federal government might have mandated this insurance coverage because Kansas also regulates motor carriers by granting the KCC regulatory authority, and because the KCC has adopted the federal minimums. It further noted Kansas has insurance minimums independent of the federal scheme, designed to ensure all motor carriers have sufficient insurance to protect the public. 52 Kan. App. 2d at 556-57 (citing *Mariott v. National Mut. Cas. Co.*, 195 F.2d 462, 466 [10th Cir. 1952]).

Hilburn argues the panel erred in holding the motor carrier laws provide an adequate substitute because *Miller* turned on "a connection between the [Health Care Provider Insurance Availability Act] and K.S.A. 60-19a02" but "[t]here is no temporal or historical tie between K.S.A. 60-19a02 and financial responsibility requirements for foreign motor carriers involved in interstate trucking." She argues "[t]he cost and availability of medical malpractice insurance was at the heart of the Supreme Court's decision in *Miller* upholding the non-economic damages cap." Hilburn also argues the "mere adoption of federal motor carrier insurance requirements by a Kansas administrative agency" is not "on the same level as comprehensive health care legislation unique to Kansas implemented as a substitute for rights taken away by K.S.A. 60-19a02." And she argues federal law imposes the insurance minimums and that the KCC could impose neither a lower nor a higher limit, citing 49 C.F.R. § 355.25(a).

Importantly, Hilburn does not argue the minimum insurance coverage mandated by these laws fails to supply guaranteed recovery in an amount necessary to satisfy the quid pro quo analysis. Like the Health Care Provider Insurance Availability Act's insurance requirements, the motor carrier laws and regulations make, for plaintiffs like

Hilburn, "the prospects for recovery of at least the statutory minimums directly available as a benefit . . . when there is a finding of liability. This is something many other tort victims do not have." *Miller*, 295 Kan. at 662.

As to Hilburn's remaining arguments, I would conclude: (1) the lack of a temporal or historical connection between the cap and the motor carrier laws does not matter; (2) Kansas law need not be the *sole* source of the substitute remedy; and (3) the substitute remedy of mandatory insurance is created by the comprehensive regulatory network of federal and state law and that network of laws provides an adequate substitute remedy for the damage cap.

As to the first point, the temporal or historical connection between motor carrier laws and the cap are not relevant to whether one supplies an adequate substitute for the other. As noted above in the discussion of *Lemuz*, under the second step of the quid pro quo analysis, the court need not look only to contemporaneous quid pro quo within the same statutory enactment containing the cap. See *Lemuz*, 261 Kan. at 959-60. Also, in determining whether there was an adequate substitute remedy for the cap's application, the *Miller* court noted simply that "[a]s a medical malpractice plaintiff, Miller's damages cap operates within the context of the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act." 295 Kan. at 662. The decision did not suggest, however, that the court could only look to the Health Care Provider Insurance Availability Act as a potential substitute for the cap because of a particular relationship between the two. Rather, the two provided the context of the case because both applied under the facts. In fact, while the cost and availability of medical malpractice insurance was central to the court's analysis under the first step of the quid pro quo test about whether the cap served a public policy purpose, it was not central to the court's second-step analysis. See 295 Kan. at 661-62.

In addition, in *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 337, 362, 789 P.2d 541 (1990), the court upheld the damage cap against a facial section 5 and 18 challenge. *Samsel* answered a certified question from the United States District Court for the District of Kansas that broadly applied to all tort plaintiffs—not just those bringing a medical malpractice action—and essentially asked if the damage cap was facially unconstitutional. In answering that it was not, the court broadly discussed the availability and affordability of all liability insurance, not just insurance covering medical malpractice. This analysis applies here even though *Miller* overruled *Samsel* because *Samsel* "premised its inquiry at step two on an interpretation of K.S.A. [60-19a02(d)] . . . that we cannot accept." 295 Kan. at 658. That premise related to how the reduction of damages would operate under the statute. This disagreement did not impact *Samsel*'s suggestion that the cap can be constitutionally applied to plaintiffs other than those injured by medical malpractice, however. The essential point I take from *Samsel* is that a public policy relationship between the damage cap and the substitute remedy suffices.

I thus conclude a temporal or historical connection between the laws that supply the substitute and the cap is unnecessary.

Second, Hillburn argues the substitute remedy must be found in Kansas statutes and we cannot rely on the $750,000 policy limit mandate of federal law. Granted, our caselaw strongly suggests—but does not hold—that the substitute remedy must be found in a state statute. Step two of the quid pro quo analysis in the caselaw turns on whether "*the legislature* substituted an adequate statutory remedy for the modification to the individual right at issue." (Emphasis added.) *Miller*, 295 Kan. at 657; see *Bair*, 248 Kan. 824, Syl ¶ 11 ("The *legislature* can modify the common law so long as *it provides* an adequate substitute remedy for the right infringed or abolished." [Emphasis added.]).

These statements appear to be more artifacts of the context of the cases than a statement of a requirement, however. In every quid pro quo case to date, the source of the substitute remedy found to satisfy the second step of the quid pro quo inquiry has been state law. See *Miller*, 295 Kan. at 663 (holding medical malpractice insurance minimums mandated by state law provided substitute for limitation on noneconomic damages); *Lemuz*, 261 Kan. at 959 (holding medical malpractice insurance minimums mandated by state law provided substitute for ban on corporate negligence claim against hospital providing staff privileges to tortfeasor-doctor); *Aves*, 258 Kan. at 523-24 (holding medical malpractice minimums mandated by state law provided substitute remedy for bar on bad-faith refusal claims against state-run excess liability insurance fund); *Bair*, 248 Kan. at 843-44 (holding medical malpractice minimums provided substitute remedy for abrogation of vicarious liability claim against health care provider's employer); *Samsel*, 246 Kan. at 362-63; see also *Rajala*, 233 Kan. at 441 (holding Workers Compensation Act's abrogation of right to sue fellow employee in tort did not violate section 18 because the Act "removes certain common law remedies for injured employees but provides a statutory substitute therefor," which "is basically a matter of public policy"); *Manzanares*, 214 Kan. at 599 (holding KAIRA's partial bar on recovery of noneconomic loss arising from automobile accidents did not violate due process by taking a property right without compensation, and commenting that because KAIRA assures prompt payment of economic losses, to the extent that it limits ability to recover nonpecuniary damages the right received in exchange is "no less adequate").

Nothing in these decisions mandated that Kansas law be the sole source of the substitute remedy, however. Rather, the cases broadly require an available remedy. For example, *Miller* established that an "available source of recovery" from mandatory insurance coverage can constitute an adequate substitute remedy. *Miller*, 295 Kan. at 662. More generally, this court's caselaw has

"long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo." *Bair*, 248 Kan. at 842.

The evaluation of the substitute remedy's adequacy therefore turns on the balance of the derogation of the plaintiff's rights and the available substitute at the time of the section 18 challenge, regardless of the source of the mandate. See *Bair*, 248 Kan. at 843-44 (holding medical malpractice insurance requirements existing "[a]t the time of the malpractice alleged by the plaintiff" were adequate to support amendment eliminating vicarious liability claims against doctors' employers because quid pro quo would have been sufficient if amendment was part of original Act); see also *Miller*, 295 Kan. at 662-65 (considering "continued adequacy of the $250,000 limitation that has admittedly devalued over time due to the legislature's failure to adjust it" but concluding failure to increase the cap had not "sufficiently diluted the substitute remedy to render the present cap clearly unconstitutional when viewed in light of [other statutory provisions] that directly and exclusively benefit a medical malpractice plaintiff"). If an adequate substitute for a common-law right infringed upon is mandated and available, the purposes of sections 5 and 18 are satisfied.

In a damages cap case, the Kansas Constitution guarantees the litigant gets the benefit of something valuable in place of the loss of the right to be made whole through damages. See *Miller*, 295 Kan. at 656 (discussing purpose of right to damages protected by section 18). This guarantee is not undermined based on how the exchange occurs. The caselaw shows the quid pro quo test is satisfied when the litigant gets the benefit of the guarantee. It does not matter whether the Legislature provided for the guarantee when it infringed on the right, see *Manzanares*, 214 Kan. at 599; or whether the Legislature infringed the right after providing for the benefit, see *Bair*, 248 Kan. at 843-44, and

67

*Rajala*, 233 Kan. at 441-42. As for mandatory insurance requirements, the quid pro quo is the assured recovery of one's judgment—or a substantial enough part of it. See *Miller*, 295 Kan. at 662.

Finally, I would hold the network of laws that provides this guarantee of recovery through mandatory insurance satisfied the test. Even assuming Enerpipe carried insurance only because of federal requirements, motor carrier regulation cannot be easily characterized as exclusively a state or federal product. Kansas has incorporated federal law into its regulations. Plus, a review of motor carrier regulations reveals that motor carriers are governed by interrelated schemes of state and federal regulation imposed through statutes and through administrative agencies tasked with implementing the statutes. Which laws control a given aspect of motor carrier operations may depend on the type of carrier; the cargo carried; the origin, destination, and travel route of the subject cargo; and the subject of the regulation, e.g., financial responsibility and driver and vehicle requirements. See 49 U.S.C. § 14501(a)(2), (c)(2)(A) (outlining areas related to motor carriers of persons and property in which states' regulatory authority not limited); K.S.A. 66-1,129(a) (outlining areas in which KCC has regulatory authority over motor carrier safety).

The regulation of entities operating commercial vehicles in interstate commerce is only part of these schemes. And whether state or federal laws apply turns on other factors. As the Court of Appeals panel concluded, through Kansas' own statutory scheme the Legislature has regulated motor carriers in a manner complementary to federal law so that all carriers who operate their vehicles on Kansas roadways meet minimum financial responsibility requirements. The Legislature has therefore provided Kansas victims of motor carrier negligence a substantial, individualized remedy in the form of an assured source from which to recover judgments in recompense.

In summary, I conclude (1) the various statutes and regulations mandating motor carrier liability insurance and K.S.A 60-19a02 are reasonably necessary in the public interest to promote the public welfare and (2) through these statutes and regulations, the Legislature has substituted an adequate statutory remedy for Hilburn's right to have a jury determine her damages. Because I reach these conclusion, I need not discuss the parties' arguments about the KAIRA. My conclusions that the motor carrier liability insurance requirements satisfy the quid pro quo test means that, in my view, K.S.A. 60-19a02 does not violate Hilburn's rights under either section 5 or section 18 of the Kansas Constitution Bill of Rights.

BILES, J., joins the foregoing dissenting opinion.